DIAMOND STATE INSURANCE COMPANY *et al.*, Plaintiffs-Appellees, v. CHESTER-JENSEN COMPANY, INC., Defendant-Appellant (The People *ex rel.* George B. Peters, Chairman of the Capital Development Board, Defendant).

First District (5th Division)   No. 1—90—1760

Opinion filed February 11, 1993.

Keith F. Bode, Joseph Bisceglia, and Gabrielle Sigel, all of Jenner & Block, of Chicago, and Robert R. Reeder, of Philadelphia, Pennsylvania, for appellant.

L. Barrett Bodach, of Heineke, Burke, Healy & Bodach, of Chicago, for appellees.

PRESIDING JUSTICE GORDON delivered the opinion of the court:

Plaintiff insurance companies brought this action for declaratory judgment seeking a determination that there was no duty to defend their insured, appellant Chester-Jensen Company, Inc. (Chester-Jensen), in a breach of contract and warranty action filed against Chester-Jensen by the State of Illinois. The State's complaint in the underlying litigation seeks damages from certain defendants, including Chester-Jensen, resulting from the failure of the air conditioning system installed in the State of Illinois Center to adequately cool the building during the summers of 1985 and 1986. Plaintiffs filed a motion for summary judgment, contending that the insurance policies involved did not cover this potential liability. The trial court granted plaintiffs' motion for summary judgment and Chester-Jensen appeals, contending that Illinois law requires that the policies be interpreted to provide coverage. In the alternative, Chester-Jensen contends that the trial court erred in applying Illinois law and that, under Pennsylvania law, plaintiffs would be required to defend it in the underlying litigation.

FACTS

Chester-Jensen is a Pennsylvania corporation which maintains its principal place of business in that State. It is engaged in the manufacture of refrigeration and other heat-exchange equipment. In 1982, Chester-Jensen furnished 100,000-pound ice builders (thermal energy storage units) and ancillary equipment to be incorporated into the heating, ventilation and air conditioning (HVAC) system of the State of Illinois Center located in Chicago, Illinois. These thermal banks were installed in the building by two subcontractors.

After the air conditioning system failed to perform as expected, the State of Illinois brought suit in People of the State of Illinois *ex rel.* George Peters v. Murphy-Knight (Cir. Ct. Cook Co.), No. 87—L—7496, joining as defendants 14 entities, including Chester-Jensen. The State's complaint alleged that in the summers of 1985 and 1986 the building experienced extremely high indoor temperatures of over 90 degrees Fahrenheit on a regular basis and that temperatures of over 110 degrees Fahrenheit were present in some cases. According to the allegations of the State's complaint, these temperatures made the building "virtually uninhabitable" as the temperatures were so high that ordinary office work and retail operations were "impossible."

The complaint alleged that the cause of these excessive temperatures was "an inadequately designed and defectively installed and constructed air conditioning system." Specifically, with respect to Chester-Jensen, the State alleged in count VIII of its complaint that Chester-Jensen had breached its contract to provide thermal banks and ancillary equipment in conformance with the contract specifications. In count IX of its complaint, the State alleged that Chester-Jensen breached its express warranties that the thermal banks would "produce the capacities and meet the specifications" required by the contract and as published by Chester-Jensen. Count X of the complaint charged fraud against Chester-Jensen, alleging that it knowingly misrepresented the output capability of the thermal banks. Chester-Jensen does not contend that the policies cover the allegations contained in the fraud count and it is therefore not a part of this appeal.

According to the complaint, the State "will expend at least $10,000,000 on modification and repairs to the heating, ventilation and air conditioning systems in order to have a habitable state office building in Chicago." The complaint stated that in "addition to economic damages" it suffered other damages, including:

> "a. lost rent from commercial tenants who refused to pay their rent because of extreme heat in the building;
>
> b. lost work days from State employees who became ill and had to go either to a hospital or home because of the heat;
>
> c. lost productivity from State employees who remained at work but who were unable to perform their duties sufficiently because of the heat in the building;
>
> d. excess electrical consumption caused by the widespread use of portable electric fans in the building by employees and by commercial tenants."

During the period of time at issue, Chester-Jensen was covered by two separate insurance policies. Plaintiff Diamond State, a Delaware corporation with its principal place of business in Pennsylvania, issued Chester-Jensen a general liability insurance policy for the period between October 18, 1984, through October 5, 1985. Transco Insurance Services was listed as Diamond State's authorized representative under a Chicago address on the first policy. The second policy was issued by Illinois Insurance Exchange Transco Syndicate No. 1 also under a Chicago address. This policy covered the period of October 5, 1985, to October 5, 1986. These policies provided that "the company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of *** bodily injury or *** property damage to which this insurance applies, caused by an occurrence."

The policies contain the following definitions among others:

" 'Bodily injury' means injury, sickness or disease sustained by any person which occurs during the policy period, including death at any time resulting therefrom;

'occurrence' means an accident including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured;

'property damage' means (1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period ***."

The policies also contained a number of explicit exclusions from coverage which included exclusion (e) (hereinafter insured's product exclusion). This exclusion provides that the insurance does not apply:

"to loss of use of tangible property which has not been physically injured or destroyed resulting from

(1) a delay in or lack of performance by or on behalf of the named insured of any contract or agreement, or

(2) the failure of the named insured's products or work performed by or on behalf of the named insured to meet the level of performance, quality, fitness or durability warranted or represented by the named insured ***."

Additionally, each policy provided that "[it] shall not be valid unless completed by the attachment hereto of a declarations page ***

and countersigned on the aforesaid declarations page by a duly authorized representative of the company."

Chester-Jensen demanded that plaintiffs defend and indemnify it in the underlying litigation pursuant to its insurance policies. Plaintiffs undertook defendant's defense, but reserved their right under the policies to deny coverage. On June 17, 1988, plaintiffs filed an action for declaratory judgment pursuant to section 2—701 of the Illinois Code of Civil Procedure (Ill. Rev. Stat. 1987, ch. 110, par. 2—701), naming Chester-Jensen, Inc., and the People of the State of Illinois ex rel. George Peters as defendants. Plaintiffs alleged that the State's claims in the underlying litigation did not arise out of an "occurrence" and were not property damages covered by the policies because such claims were for economic losses which resulted from Chester-Jensen's breach of contract, breach of express warranty, and fraud.

On February 7, 1990, plaintiffs filed a motion for summary judgment pursuant to section 2—1005 of the Illinois Code of Civil Procedure. (Ill. Rev. Stat. 1989, ch. 110, par. 2—1005.) Plaintiffs alleged that they did not have a duty to defend or indemnify Chester-Jensen in the underlying litigation because there was no potential coverage under the insurance policies. The trial court granted plaintiffs' motion for summary judgment finding that no duty to defend was present under the policies with respect to the underlying complaint. Chester-Jensen appeals from the trial court's order granting plaintiffs' motion for summary judgment.

OPINION

■■ On appeal, appellant Chester-Jensen first contends that the trial court erred in determining that under Illinois law plaintiffs had no obligation to defend it in the underlying action. We disagree. An insurance company's obligation to represent its insureds depends on the allegations of the underlying complaint and the provisions of the insurance policy. (*Thornton v. Paul* (1978), 74 Ill. 2d 132, 384 N.E.2d 335; *Tuell v. State Farm Fire & Casualty Co.* (1985), 132 Ill. App. 3d 449, 477 N.E.2d 70.) The complaint must be liberally construed and all doubts resolved in favor of coverage for the insured. (*Maryland Casualty Co. v. Chicago & North Western Transportation Co.* (1984), 126 Ill. App. 3d 150, 466 N.E.2d 1091.) The "general rules which favor the insured[, however,] must yield to the paramount rule of reasonable construction which guides all contract interpretations." (*Travelers Insurance Cos. v. P.C. Quote, Inc.* (1991), 211 Ill. App. 3d 719, 724, 570 N.E.2d 614.) A duty to defend will arise when the allega-

tions of the underlying complaint may potentially come within the coverage of the policy. *Zurich Insurance Co. v. Raymark Industries, Inc.* (1987), 118 Ill. 2d 23, 514 N.E.2d 150.

In contending that Illinois law recognizes a duty to defend in this case, Chester-Jensen first argues that coverage is present under the "on account of bodily injury" provision of the policies. Chester-Jensen reasons that the lost productivity and work days for which the State seeks compensation resulted from the absence or decreased productivity of State employees who suffered "bodily injury" in that they became ill from the heat. Secondly, Chester-Jensen argues that coverage is extended under both prongs of the "property damage" provision as defined in the definitional section of the policy. According to Chester-Jensen, "physical injury" within the meaning of the first prong of the property damage definition is present because the complaint's allegations of modification and repair constitute an allegation of physical injury to the HVAC system as a whole. With respect to the second prong of the definition, Chester-Jensen contends that the high temperatures in the building constituted an "occurrence" within the meaning of the policies which resulted in the "loss of use" of the building, thus invoking coverage. Plaintiffs deny that any of the coverage provisions encompass the claims against Chester-Jensen and they further argue that regardless of the applicability of the coverage provisions, these claims fall within the "insured's product exclusion" of the policy.

■ Chester-Jensen's first argument, that coverage is present under the "bodily injury" provision of the policy, is not persuasive. It ignores the nature of the complaint being made by the State. The State is not bringing this action on behalf of its employees, seeking recovery for damages sustained by them on account of their illness or other bodily injury. Nor is the State seeking to be reimbursed or indemnified for its liability to its employees. Rather, Chester-Jensen is claiming coverage for its liability to the State for the State's economic losses simply because those economic losses of the State are alleged in part to be attributable to illness or injury of the State's employees.

Appellant's proposed interpretation would distort the meaning of this provision and extend its reach so as to provide coverage for any liability where bodily injury is a tangential factor. It is manifest that the core of the State's claim for damages against Chester-Jensen is a claim for its economic losses. The fact that the State's claim for its economic losses as a result of diminished productivity may have been occasioned in part by the illness of its employees does not transmute its economic claim for which it seeks recovery from Chester-Jensen

into one for "bodily injury." See *Sentry Insurance Co. v. S & L Home Heating Co.* (1980), 91 Ill. App. 3d 687, 414 N.E.2d 1218 (employer claims for lost worker productivity due to eye irritation not covered by general liability policy which included a provision that insurer was obligated to pay damages "on account of bodily injury or property damage" because such damages were economic injury to the employer). Accord *Bituminous Casualty Corp. v. Gust K. Newberg Construction Co.* (1991), 218 Ill. App. 3d 956, 964, 578 N.E.2d 1003 (which interpreted the same complaint and policy provisions at issue here in determining whether Bituminous had a duty to defend the general contractor of the State of Illinois Center. The court stated that the "State's complaint alleges physical injury to State employees in that some had to be taken to the hospital, but we find these allegations are made, not for recovery for the injured employees, but are offered as evidence of the problems that resulted from the defective HVAC system").

Chester-Jensen cites one case, *Minnick's Inc. v. Reliance Insurance Co.* (1980), 47 Md. App. 329, 422 A.2d 1028, where the court determined that a loss of consortium claim brought by a spouse of an injured party was sufficient to invoke a duty to defend under the "bodily injury" portion of the policy. We are not persuaded by the reasoning of the Maryland court on this issue, particularly where it diverges from the reasoning of our own court in *Bituminous* and *Sentry*. Moreover, the loss of consortium claim in *Minnick's* is distinguishable from our case since loss of consortium claims are traditionally treated as claims for bodily injury and are derivative of the claim for bodily injury sustained by the other spouse. (See *Brown v. Metzger* (1983), 118 Ill. App. 3d 855, 455 N.E.2d 834; *Clark v. City of Chicago* (N.D. Ill. 1984), 595 F. Supp. 482.) Here, the State's claim sounds in contract and seeks compensation for economic injury. Consequently, the allegations of the State's complaint with respect to its loss of employee productivity are insufficient to bring them within the scope of the policy provisions for coverage of damages "on account of bodily injury."

■ We turn now to Chester-Jensen's contention that coverage exists under the "property damage" definition in the policies. As stated earlier, this provision extends coverage for "all sums which the insured shall become legally obligated to pay as damages because of *** property damage to which this insurance applies, caused by an occurrence." The definition section of the policy provides a two-pronged definition of "property damage," stating that " 'property damage' means (1) physical injury to or destruction of tangible property *** or

(2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence." Chester-Jensen contends that coverage is provided under either prong of the "property damage" definition.

With respect to the first prong, Chester-Jensen maintains that the State's complaint can be deemed to allege physical injury of tangible property. We disagree. We find no express allegations of physical injury to property, rather only allegations that Chester-Jensen's thermal units failed to perform their anticipated function. Nowhere in its complaint does the State allege that its HVAC system, or any portion or component thereof, was physically damaged, as opposed to having become simply inoperative because of the failure of the components to perform as warranted.

Moreover, the recovery sought for economic losses which it sustained are fully consistent with losses suffered through contract failure. In its complaint, the State alleges that it suffered damages in the form of lost rent from commercial tenants, lost productivity from State employees, excess electrical consumption from the use of electric fans and costs incurred for modification and repairs to the system. These allegations of economic loss cannot be deemed to satisfy the prerequisites under the policy provision that for coverage to be invoked physical injury to property must be alleged. See *CMO Graphics, Inc. v. CNA Insurance* (1983), 115 Ill. App. 3d 491, 450 N.E.2d 860 (holding that no coverage existed when complaint did not claim any "tangible property damage" and sought recoupment of economic losses involving financial investments, lost profits and lost good will).

The cost of repairing or replacing the insured's own allegedly defective part is clearly not considered property damage under the policies in question. (*Hamilton Die Cast, Inc. v. United States Fidelity & Guaranty Co.* (7th Cir. 1975), 508 F.2d 417, 419-20 ("We do not think that the mere inclusion of a defective component, where no physical harm to the other parts results therefrom, constitutes 'property damage' within the meaning of the policy. *** Idled machinery is not injured or destroyed tangible property and, therefore, there is no 'property damage' within the coverage of the policy"); accord *Sentry Insurance Co. v. S & L Home Heating Co.* (1980), 91 Ill. App. 3d 687, 414 N.E.2d 1218 (insured was sued after the HVAC system it installed in a plant failed to adequately perform; court determined that the expense of repairing the HVAC system was economic losses which would not have been covered under the policy and only found coverage after specific physical injuries to portions of the HVAC system were alleged); *Chambers Gasket & Manufacturing Co. v. General Insurance*

*Co. of America* (1975), 29 Ill. App. 3d 998, 1000, 331 N.E.2d 203 (claim for the value or replacement of the insured's defective gaskets "was clearly not within the scope of the policy coverage").

Although the allegations with respect to repair could be consistent with physical injury to other portions of the system aside from the thermal banks themselves, they cannot by themselves denote that any such physical damage took place, particularly in the context of a claim against multiple defendants who were cumulatively active in the manufacture or installation of the entire system.

Mere allegations of repair and modification without any allegations of physical injury are insufficient to invoke coverage under the physical injury prong of the property damage provision. The decision of this court in *Bituminous Casualty Corp. v. Gust K. Newberg Construction Co.* (1991), 218 Ill. App. 3d 956, 578 N.E.2d 1003, is particularly persuasive. As noted earlier, that case addressed the duty of an insurance company (Bituminous) to defend the general contractor of the State of Illinois Center (Newberg) in the same underlying action involved here. Interpreting the identical complaint and general liability insurance policy provisions at issue here, the court found that there was no duty to defend the contractor. Concerning the allegations of physical injury, the court found that "the State's underlying complaint does not allege property damage due to physical injury to or destruction of tangible property. The complaint alleges only economic losses due to the installation of an inadequate HVAC system." 218 Ill. App. 3d at 963-64; *Dreis & Krump Manufacturing Co. v. Phoenix Insurance Co.* (7th Cir. 1977), 548 F.2d 681, 688 (holding that no duty to defend was present because the underlying complaint brought against insured press brake manufacturer did not allege damage to tangible property even though such complaint alleged that plaintiff was forced to "expend sums of money in the form of labor and equipment in an attempt to rectify these defects"); see also *Thermex Corp. v. Fireman's Fund Insurance Cos.* (Minn. App. 1986), 393 N.W.2d 15 (holding that no duty to defend heating contractor existed when underlying complaint sought replacement costs for defective work and materials and rental costs for substitute quarters because there were no allegations of physical injury to the building and no "occurrence" within the meaning of the policy).

Chester-Jensen's reliance on *Pittway Corp. v. American Motorists Insurance Co.* (1977), 56 Ill. App. 3d 338, 370 N.E.2d 1271, *W.E. O'Neil Construction Co. v. National Union Fire Insurance Co.* (N.D. Ill. 1989), 721 F. Supp. 984, *Elco Industries, Inc. v. Liberty Mutual Insurance Co.* (1980), 90 Ill. App. 3d 1106, 414 N.E.2d 41, and *Mara-*

*thon Plastics, Inc. v. International Insurance Co.* (1987), 161 Ill. App. 3d 452, 514 N.E.2d 479, is misplaced.

The coverage requirements in *Pittway* were entirely different from the requirements of the policies here in issue. The policy coverage provision in *Pittway* required only "injury to or destruction of tangible property." (*Pittway Corp.*, 56 Ill. App. 3d at 341.) Thus the provision in *Pittway*, unlike the first prong definition of the policies here in issue, did not require "physical injury" as a prerequisite for recovery. Moreover, the *Pittway* policy did not contain a second prong definition. Consequently, the *Pittway* court felt free to determine that property damage was present under its policy "irrespective of any physical injury" to property. This freedom is not present here where the policy distinguishes between physical injury and loss of use, spelling out the different prerequisites under each.

Chester-Jensen urges that its view is strongly supported by *Elco Industries, Inc. v. Liberty Mutual Insurance Co.* (1980), 90 Ill. App. 3d 1106, 414 N.E.2d 41. We disagree. That case involved the installation of defective governor regulating pins in various engines. In *Elco*, the court determined that a duty to defend was present when the defective pins supplied by the insured had caused minor damage to relatively inexpensive gaskets and plugs contained in the engines.

Although the physical damage in *Elco* was relatively slight, such damage had nevertheless occurred. The underlying complaint in *Elco* "charged that the defect required Elco to test, identify, reinspect, rip out, replace, and repair the pins installed in its engines" and the record disclosed that the replacement of the pins physically injured several gaskets and at least one plug per engine. (90 Ill. App. 3d at 1111.) The *Elco* court recognized that "[t]he mere installation or removal of defective parts which causes no destruction or injury to the third person's products *** does not constitute property damage," but found coverage based on the damaged gaskets and plugs. (90 Ill. App. 3d at 1111-12.) Unlike the complaint in *Elco*, however, the complaint here does not indicate injury to any portion of the system. Without such an allegation, we cannot determine that there is coverage under this portion of the property damage provisions.

Similarly, Chester-Jensen's reliance on *W.E. O'Neil Construction Co. v. National Union Fire Insurance Co.* (N.D. Ill. 1989), 721 F. Supp. 984, is misplaced. There, unlike the allegations here, the underlying complaint clearly alleged that the component of the insured (steel mesh) caused damage to other portions of the structure (garage) in which it was installed. 721 F. Supp. at 986-87.

We recognize that our holding is inconsistent with *Marathon Plastics, Inc. v. International Insurance Co.* (1987), 161 Ill. App. 3d 452, 514 N.E.2d 479. In *Marathon*, the insured supplied pipe and gaskets for a water system. After the water system was completed, the gaskets supplied by the insured leaked. The *Marathon* court, with what we believe to be an overextended reliance on *Pittway* and *Elco*, determined that property damage was present, apparently under the physical injury to tangible property prong of the policy. The court determined that after the system was constructed, it became a finished product and that the insured's gaskets leaked "caus[ing] the system to become useless and diminish[ing] its value." (161 Ill. App. 3d at 463.) The court reasoned that "even though no physical injury occurred to the water system, *** that due to the diminution in value to the system caused by the leaks, property damage has occurred." 161 Ill. App. 3d at 463.

The analysis in *Marathon* is inconsistent with the clear language and underlying purpose of the policies. Insurance policies must be interpreted by the standard of construction and interpretation of contracts in general. (*Zitnik v. Burik* (1961), 395 Ill. 182, 69 N.E.2d 888; *International Minerals & Chemical Corp. v. Liberty Mutual Insurance Co.* (1988), 168 Ill. App. 3d 361, 522 N.E.2d 758.) The language of the policy explicitly requires "physical injury." It cannot be construed to provide coverage on the basis of loss or diminished use simply resulting from the failure of a component to perform as promised. (Accord *Bituminous*, 218 Ill. App. 3d 956, 578 N.E.2d 1003.) The construction followed in *Marathon* and urged here by Chester-Jensen ignores the overall purpose and design of a comprehensive general liability policy. If the *Marathon* interpretation were to be adopted as urged by Chester-Jensen, the policy would not only provide insurance against tort liability, but would function as a performance bond as well. As the court in *Qualls v. Country Mutual Insurance Co.* (1984), 123 Ill. App. 3d 831, 462 N.E.2d 1288, stated:

> "[C]omprehensive general liability policies like the one here are intended to protect the insured from liability for injury or damage to the persons or property of others; they are not intended to pay the costs associated with repairing or replacing the insured's defective work and products, which are purely economic losses. [Citations.] Finding coverage for the cost of replacing or repairing defective work would transform the policy into something akin to a performance bond." *Qualls*, 123 Ill. App. 3d at 833-34.

See also Henderson, *Insurance Protection for Products Liability & Completed Operations—What Every Lawyer Should Know*, 50 Neb. L. Rev. 415, 441 (1971).

> "The risk intended to be insured against is the possibility that the goods, products or work of the insured, once relinquished or completed, will cause bodily injury or damage to property other than to the product or completed work itself, and for which the insured may be found liable. *** *The coverage is for tort liability* for physical damages to others *and not for contractual liability of the insured for economic loss* because the product or completed work is not that for which the damaged person bargained." (Emphasis added.)

■ Chester-Jensen next argues that the allegations of the State's complaint satisfy the second portion of the property damage definition, namely "loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence." Chester-Jensen argues that the State's complaint alleges that the building was virtually uninhabitable and that this loss of use came from the "continuous or repeated exposure to conditions" which were "neither expected nor intended from the standpoint of the insured."

While it is true that the complaint alleges the virtual uninhabitability of the building and its consequential loss of use, that condition alone is wholly insufficient to invoke coverage without the presence of an "occurrence." As previously noted, the policies define "occurrence" as an *"accident* including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured." (Emphasis added.)

An accident, by its very nature contemplates an event that is unforeseen and neither intended nor expected. (See *Travelers Insurance Companies*, 211 Ill. App. 3d at 726 (" 'accident' is defined as 'an unforeseen occurrence *** of untoward or disastrous character' or 'an undesigned sudden or unexpected event' ").) Here, the State's complaint does not allude to any such accident, it merely alleges that the product failed to perform and as a result the building was too hot or too cold. The mere failure of a product to perform as warranted is not beyond the realm of expectation and is foreseeable by the parties. In fact, it is this expectation that provides the impetus for requiring a warranty from the vendor in the first place. While such failure is most likely to be unintentional, it cannot be considered an "accident" within the meaning of the policy because the "natural and ordinary

consequences of an act do not constitute an accident." *Aetna Casualty & Surety Co. v. Freyer* (1980), 89 Ill. App. 3d 617, 619, 411 N.E.2d 1157; *Bituminous*, 218 Ill. App. 3d at 966 ("the allegations of too hot and too cold temperatures in the building are no more than the *natural and ordinary consequences* of installing an inadequate HVAC system)." (Emphasis added.)

Chester-Jensen, however, contends that the high temperatures in the building do constitute an "exposure to conditions which results in property damage neither expected or intended by the insured." For support, it relies on *United States Fidelity & Guaranty v. Wilkin Insulation Co.* (1991), 144 Ill. 2d 64, 578 N.E.2d 926, wherein the Illinois Supreme Court found under a similar policy that an "occurrence" was present when the insured installed asbestos insulation in a building. The court determined that the "buildings and their contents (*e.g.*, carpets, upholstery, drapery, etc.) are virtually contaminated or impregnated with asbestos fibers, the presence of which poses a serious health hazard to the human occupants" and that such a continuous exposure to the released fibers was an "occurrence" as defined by the insurance policies. 144 Ill. 2d at 75, 77.

Chester-Jensen's reliance on *Wilkin* is misplaced. *Wilkin* involved the installation of products which directly damaged the building through the dissemination and impregnation of asbestos fibers throughout the premises. Moreover, the damage was not a result of the failure of the asbestos to perform its contractual function as an insulator. Rather its detrimental impact was caused by a wholly ancillary and coincidental phenomenon, namely the diffusion of its harmful fibers.

Therefore, unlike the facts in this case, the resulting condition in *Wilkin* was not encompassed by the normal expectancies which are inherent in the risk of product or performance failure. Furthermore, the court in *Wilkin* specifically found that the hazards now known to be inherent in asbestos use as insulation were neither known nor intended by the parties when installed. In contradistinction, it would be inconceivable that the parties would not have foreseen abnormal increases in temperatures as a possible result of the failure of the HVAC system. Consequently, we conclude that Chester-Jensen's attempts to invoke coverage under the second half of the property damage provision fails because there has been no "occurrence" within the meaning of the policies.

■ Lastly, even if coverage were extended under the "loss of use" provision without requiring the concomitant "occurrence," such coverage would be revoked under exclusion (e) of the policies, the in-

sured's products exclusion. (*St. Paul Surplus Lines Insurance Co. v. Diversified Athletic Services* (N.D. Ill. 1989), 707 F. Supp. 1506, 1509, citing *Western Casualty & Surety Co. v. Brochu* (1985), 105 Ill. 2d 486, 475 N.E.2d 872 (liability which falls within general declaration of policy's coverage may be specifically removed from such coverage by exclusion).) As previously noted, under the terms of exclusion (e), coverage would not extend "to loss of use of tangible property which has not been physically injured or destroyed resulting from *** the failure of the named insured's products or work performed by or on behalf of the named insured to meet the level of performance, quality, fitness or durability warranted or represented by the named insured."

The State's claim in this case is one for breach of contract and breach of warranty. The complaint alleges that Chester-Jensen had breached its contract to provide thermal banks and ancillary equipment which conformed to the contract specifications and breached its express warranties that the thermal banks would "produce the capacities and meet the specifications as called." Further, for the reasons previously discussed, we cannot find a basis in the allegations of the underlying complaint to establish physical injury to property. (*Sentry,* 91 Ill. App. 3d 687, 414 N.E.2d 1218; *Bituminous,* 218 Ill. App. 3d 956, 578 N.E.2d 1003.) Thus, the claim would fall squarely within the named products exclusion provisions of the policies. *Unifoil Corp. v. C N A Insurance Cos.* (1987), 218 N.J. Super. 461, 472, 528 A.2d 47, 50-51 (determining that eight of nine claims against insured were actually claims for breach of warranty and thus precluded from coverage under the insured's product exclusion); see also *Sting Security, Inc. v. First Mercury Syndicate, Inc.* (D. Md. 1992), 791 F. Supp. 555, 562 (since underlying complaint was predicated on failure of insured's product to perform as warranted, insured's product exclusion operates to bar coverage).

For the foregoing reasons, we find that under Illinois law plaintiffs have no duty to defend Chester-Jensen in the underlying action.

■ Chester-Jensen next contends that it was error to apply Illinois law and that a different outcome would have been forthcoming had the law of Pennsylvania been applied. We disagree. The trial court correctly applied Illinois conflict of law principles in determining that the substantive law of Illinois controls the interpretation of these insurance policies.

The insurance policies in question do not contain a choice of law provision. In the absence of such a provision, the general choice of law rules of the forum State, Illinois, clearly control. (*Thieme v. Union Labor Life Insurance Co.* (1956), 12 Ill. App. 2d 110, 138 N.E.2d

857.) Chester-Jensen contends that the choice of law rule to be followed looks to apply the law of the State that has the "most significant contacts" with the policies.

This "most significant contacts" rule has been applied in Illinois to contract actions in general. (See *Purcell & Wardrope Chartered v. Hertz Corp.* (1988), 175 Ill. App. 3d 1069, 530 N.E.2d 994.) The factors considered under this approach should be "evaluated in light of the relevant policies of the forum and other interested States and those States' interest in the issue." (*Boise Cascade Home & Land Corp. v. Utilities, Inc.* (1984), 127 Ill. App. 3d 4, 13, 468 N.E.2d 442.) This rule has also been followed by the Restatement with respect to contracts litigation. Restatement (Second) of Conflicts of Laws §188 (1971).

In *Hofeld v. Nationwide Life Insurance Co.* (1975), 59 Ill. 2d 522, 322 N.E.2d 454, the rule was specifically applied to insurance contracts. There, the Illinois Supreme Court, speaking in the context of a group health insurance policy, stated:

> "[I]nsurance contract provisions may be governed by the location of the subject matter, the place of delivery of the contract, the domicile of the insured or of the insurer, the place of the last act to give rise to a valid contract, the place of performance, or other place bearing a relationship to the general contract." (59 Ill. 2d at 528.)

Plaintiffs, however, contend that the place of issuance should predominate over any other contacts, citing *Jadczak v. Modern Service Insurance Co.* (1987), 151 Ill. App. 3d 589, 503 N.E.2d 794. Plaintiffs, pointing to a provision in the Transco policy which provides that "[plaintiffs] with offices at 175 West Jackson Boulevard Chicago, Illinois 60604, issues [*sic*] this insurance contract to the named insured," argue that Illinois law controls because it was the State in which that policy was issued.

However, we do not read *Jadczak* with the same rigidity as plaintiffs would urge. For one thing, *Jadczak* specifically looked to the place of the last act to give rise to a valid contract in addition to looking to the place of issuance. (151 Ill. App. 3d at 593.) Moreover, *Jadczak* relies upon *Hofeld*, which espouses the broader based "most significant contact" rule as controlling. We also note that in *Jadczak*, all relevant factors except those upon which the court predicated its determination were thinly dispersed among three different States, Illinois, Michigan, and Minnesota, and could not therefore be helpful. (151 Ill. App. 3d at 593.) We are therefore not persuaded that *Jadczak* intended to preclude consideration of any other factors aside

from the place of issuance and the place of the last act necessary to validate the policy.

We therefore agree with Chester-Jensen that the broader-based "most significant contacts" rule as postulated in *Hofeld* should apply. However, we disagree with Chester-Jensen's contention that under the *Hofeld* analysis the substantive law of Pennsylvania controls.

In urging that Pennsylvania law has the most significant contacts, Chester-Jensen points to the fact that it is a Pennsylvania corporation and maintains its principal place of business in that State, that plaintiff Diamond State has its principal place of business there, and that the policies in question were delivered to it in Pennsylvania. It contends that the delivery of the policies constitutes the last act necessary to effectuate the contract. On the other hand, as plaintiffs correctly point out, in addition to being the apparent place of issuance, Illinois is where Chester-Jensen's contract was to be performed and where the equipment, the thermal banks, was to be installed and permanently located. (See *Occidental Fire & Casualty Co. v. Padgett* (1983), 113 Ill. App. 3d 215, 446 N.E.2d 937, 940 (application of Illinois law was correct considering that the contract was to be performed in Illinois, the location of the subject matter was in Illinois and that Illinois was the place bearing a relationship to the general contract).) We also agree with plaintiffs that Illinois is where the insured risks are permanently located.[1]

Additionally, we may also consider the fact that the State of Illinois is the plaintiff which brought the underlying action which is the subject of the declaratory action before us. This underlying action was also filed in the Illinois State court system. (See *Boise*, 127 Ill. App. 3d at 13 (stating that although both parties were Delaware corporations, the place of the execution of the contract was uncertain, and that both Indiana and Illinois had contacts to the litigation, Illinois law should apply in contract action because enforcement of the contract was sought under Illinois law).) Moreover, the application of Illinois law to this case does not appear contrary to the public policies of Pennsylvania. See *Champagnie v. W.E. O'Neil Construction Co.* (1979), 77 Ill. App. 3d 136, 395 N.E.2d 990 (considering in conflict of law analysis whether the application of Illinois law would diminish or undermine any policy interest of other State); *Continental Casualty Co. v. Armstrong World Industries, Inc.* (N.D. Ill. 1991), 776 F. Supp. 1296 (commenting on the substantial simi-

---

[1]The question as to the location of the risk will be discussed more fully in the context of our later discussion of the choice of law rule proposed under Restatement (Second) of Conflicts of Law §193 (1971).

larity between the contract interpretation rules of Pennsylvania and Illinois).

Nor is it clear as Chester-Jensen contends that the last act necessary to give effect to the policies occurred in Pennsylvania. Both policies contain a provision that they will not be valid unless an attachment to the policy is completed by the insured *and* then countersigned by a representative of the insurer. Under these policies, Transco is designated as principal in one and as Diamond State's representative in the other and in each policy Transco's address is given as being in Chicago. It is therefore not unreasonable to assume that the last act necessary to validate each policy, namely the countersigning of it by a representative of the insurer, was to occur in Illinois in accordance with the address provided in the policies.

Pennsylvania's contact with this case is limited to the fact that it is the insured's home State and with respect to the Diamond State policy that Diamond State maintains its principal place of business in Pennsylvania. These factors are clearly outweighed by those favoring the application of Illinois law. Considering all relevant factors, we conclude that Illinois has more significant contacts with the policies and their interpretation than Pennsylvania.

Chester-Jensen, however, argues that if it cannot prevail under the "most significant contacts" rule applied to contracts in general, the liability insurance coverage in this case should be governed by the test provided under section 193 of the Restatement (Second) Conflicts of Laws. (Restatement (Second) of Conflict of Laws §193 (1971).) This section provides:

> "The validity of a contract of fire, surety or casualty insurance and the rights created thereby are determined by the local law of the state which the parties understood was to be the principal location of the insured risk during the term of the policy, unless with respect to the particular issue, some other state has a more significant relationship under the principles stated in §6 to the transaction and the parties, in which event the local law of the other state will be applied." Restatement (Second) of Conflict of Laws §193 (1971).

While this section does not preclude considerations of other factors in a choice of law analysis, the "location of the insured risk will be given greater weight than any other single contact in determining the state of applicable law provided that the risk can be located, at least principally in a single state." (Restatement (Second) of Conflict of Laws §193, Comment b, at 611 (1971); *Allen v. State Farm Mutual Automobile Insurance Co.* (1991), 214 Ill. App. 3d 729, 574 N.E.2d 55 (applying the Re-

statement approach to determine that Indiana law controlled because the automobile insured by the policy was principally garaged in Indiana, even though it was occasionally driven in different States).

We need not give extensive consideration to the application of the more narrowly focused "principal location of the risk" test established in Restatement (Second) of Conflict of Laws section 193 as opposed to the broader-based test described in *Hofeld*. (Restatement (Second) of Conflict of Laws §193 (1971).) Under either test we conclude that the substantive law of Illinois would apply. This conclusion is predicated on the fact that the installation of the thermal banks was to occur in Illinois and, as the banks were to become a permanent part of the system, that risk was to remain in Illinois.

Chester-Jensen argues that the thermal banks are not the risk to be insured, but rather Chester-Jensen's entire business is to be considered the insured risk. We do not find this argument persuasive. If this approach were to be followed then a bright line approach would develop where the law of the insured's home State would be applied no matter where the insured risk was undertaken. Such an approach disregards the focus on the application of the law of the State where the particular risk is located in favor of the law of the insured's home State. (*Cf.* Restatement §193 Comment *f* (captioned "Multiple risk policies," this comment provides that in certain instances courts would treat a policy insuring against risks located in several States as several policies each insuring a separate risk).) Consequently, we determine that the risk covered by the policies was located in Illinois and that the trial court correctly determined that Illinois law applied in this case.

In view of the fact that we are persuaded that under the appropriate Illinois choice of law rule the substantive law of Illinois controls, we will not proceed further to determine how this case would be decided under Pennsylvania law, although there is support for our conclusion of no coverage under the substantive law of Pennsylvania. See *American International Underwriters Corp. v. Zurn Industries, Inc.* (W.D. Pa. 1991), 771 F. Supp. 690; *Continental Casualty Co. v. Armstrong World Industries, Inc.* (N.D. Ill. 1991), 776 F. Supp. 1296 (noting the similarity between Pennsylvania and Illinois contract interpretation rules).

For the foregoing reasons, we affirm the judgment of the trial court.

Judgment affirmed.

MURRAY and McNULTY, JJ., concur.