**Ronald W. KAFKA, Plaintiff–Appellant,**

v.

**BELLEVUE CORPORATION, John M. Bellevue and Robert R. Bellevue, Defendants–Appellees.**

No. 92–1606.

United States Court of Appeals, Seventh Circuit.

Argued March 29, 1993.

Decided July 20, 1993.

David A. Kaufman, Northbrook, IL (argued), for Ronald W. Kafka.

Ronald S. Adelman, Chicago, IL (argued), for Bellevue Corp.

Marvin A. Tenenbaum, John R. McLain (argued), Greenberger, Krauss & Tenenbaum, Chicago, IL, for John M. Bellevue.

Richard P. Campbell (argued), Anthony S. DiVincenzo, Campbell & DiVincenzo, Chicago, IL, for Robert R. Bellevue.

Before BAUER, Chief Judge, ROVNER, Circuit Judge, and TIMBERS, Senior Circuit Judge.[1]

BAUER, Chief Judge.

Ronald Kafka sued John M. "Jack" Bellevue, his son Robert Bellevue, and Bellevue Corporation for failing to honor alleged guarantees on three promissory notes. The complaint was brought in federal court under diversity jurisdiction, 28 U.S.C. § 1332. After a one-day bench trial, the district court entered judgment against Kafka on two of the three counts. Kafka appeals the adverse rulings.

## I.

The parties stipulated to nearly all the relevant facts in their final, written, pretrial order. (R. 145). Unless otherwise noted, the agreed facts are as follows. Ronald Kafka is a contractor and an Illinois citizen. Jack and Robert Bellevue are California citizens. At the relevant times, Jack owned Bellevue Corporation and Robert was president. Bellevue is a California corporation with its principal place of business in Burlin-game, California. Jack and Robert were mortgage brokers who, on behalf of the corporation, found investors for real estate developments. One of those developments was a condominium project located in the Diamond Heights area of San Francisco. The developer was George Benny.

In late 1980, Jack sought to raise $500,000 for a second mortgage for Benny's Diamond Heights project. Jack was himself an investor in the project. Jack was a business acquaintance of Art McManus, Kafka's investment counselor. McManus recommended that Kafka invest in the Diamond Heights project, and Kafka took his advice. In January 1981, Kafka invested $160,000 in a second mortgage for Benny on the Diamond Heights project. For his investment, Kafka received a 32 percent share in the mortgage. After the second mortgage was made, Jack discovered that private mortgage insurance ("PMI") was not available for the project.

The parties' do not agree on the next event. Kafka alleges that Jack personally guaranteed Kafka's investment because PMI was not available for the project. Jack denies that he personally guaranteed Kafka's investment. Instead, he asserts that any assurances to Kafka were made by Bellevue Corporation. (Tr. 105).

Kafka claims that before he invested in the Benny second mortgage, Jack told him that the Diamond Heights project would be insured. (Tr. 10). Kafka testified that more than a year later, when it appeared the project could not be insured, Jack Bellevue personally guaranteed Kafka's money. (Tr. 11). Kafka recounted the exchange, stating that he asked Jack: " '[w]here is the insurance that you proposed when I invested my money in the real estate?' " Kafka further recounted that "[Jack] said that he was trying to get the insurance, but that he was having problems getting it. And I told him that I wasn't happy with that comment; that '[w]hen I invested my money into this project, I was guaranteed by you and Art McManus that I would have an insurance [sic] guaranteeing

---

1. The Honorable William H. Timbers, of the United States Court of Appeals for the Second Circuit, is sitting by designation.

my money from a reputable insurance company.'" (Tr. 10). Kafka testified that after that conversation, he had two other telephone conversations and one conversation at a meeting on June 30, 1982 with Jack, at which the guarantee was discussed. (Tr. 11, 12, 13).

Carol Kafka, Ronald Kafka's wife, was at the June meeting and testified that she heard Jack personally guarantee the loan. (Tr. 42). Although McManus was at the June meeting, he was not questioned about the meeting at trial. He did testify, however, that in early March 1981, Jack promised to personally guarantee Kafka's investment in the Benny mortgage. (Tr. 153–54). Jack's lawyer impeached McManus with his deposition testimony indicating that he could not recall whether the guarantee was personal or on behalf of the corporation. (Tr. 164–65; 169–70). McManus also testified that he and Jack had discussed the terms of the guarantee. He was impeached with his deposition that contained contradictory statements that McManus had no recollection of discussing any guarantee terms with Jack Bellevue. (Tr. 172–73). The district court found that the impeachment rendered McManus' testimony incredible. (D.Ct. opinion ¶ 15, R. 167).

Kafka produced three letters to support his claim.[2] The first letter was from Jack Bellevue and was dated March 12, 1982. It was written on Bellevue Corporation stationery, and described the bleak status of the Diamond Heights investment. In the letter, Jack apologized for the deal and wrote "we do guarantee your principal and interest. We have never had any client lose one penny and wish to continue this reputation." (R. 80, Exh. 9). The signature on the letter was "Jack M. Bellevue", with no corporate title indicated. Kafka responded in a letter dated July 8, 1982 that was sent to Jack Bellevue at Bellevue Corporation. The letter stated that "[b]ased on your personal guarantee on June

30th and your letter of March 12, 1982, demand is hereby made for payment in full, including interest to date." (R. 80, Exh. 10).

The third letter was another from Jack Bellevue. It was dated July 20, 1982, and was also on Bellevue Corporation stationery. That letter stated:

"... you can note, that our guarantee is the same as the PMI insurance guarantee which basically states, we cannot make any payment whatsoever until we have possession of the property and have gone through the normal foreclosure proceedings. You will note that this is stated on all PMI policies. We have attached a copy in case you misplaced yours. We plan to follow through the same way as if it was insured, but unfortunately this takes time."

(R. 80, Exh. 11). The letter was signed simply "Jack M. Bellevue", without any corporate title designation.

The parties' versions of the remaining events are in harmony. Benny defaulted on both his first mortgage, held by Cathedral Mortgage Corporation, and his second mortgage, held by the Bellevue investors. Both mortgage lenders foreclosed, but the Bellevue investors received nothing since the Benny second mortgage was not insured and the value of the Diamond Heights project was not high enough to satisfy the balance on the first mortgage.

In an attempt to salvage their investment, Jack proposed that Kafka join other Diamond Heights investors and become a limited partner in a new limited partnership, San Francisco Condominium, Ltd. ("SFC"). SFC was created to buy the Diamond Heights project from Cathedral, retain it for several years, then sell it for profit. (Partnership Agreement "P.A." ¶ 4, R. 121). Paragraph 9.D.(5) of the partnership agreement protected the general partners from liability for partnership losses suffered by the limited partners.[3]

---

2. Although some dispute exists about whether the letters from Jack Bellevue were admitted into evidence, the final pretrial order notes their admission at section C, page 3, items 13 and 15. (R. 145–46).

3. The paragraph states:

*Limitation of Liability* Anything in this Agreement to the contrary notwithstanding, the General Partners shall not be personally liable for the return of the capital contributions of the Limited Partners or any part thereof or the payment of any other sum to the Limited Partners and any such return or payment shall be

Before investing in SFC, Kafka and other potential investors asked their attorney, James Berent, to go to San Francisco to do a little research on the project. Berent visited the Diamond Heights condominium construction sight and met with Jack Bellevue. After the two men met, Berent purchased SFC limited partner shares for Kafka and his other clients. Kafka spent $55,900 on this investment.

When Berent returned from California he brought a fistful of papers, including a promissory note, a note secured by a deed of trust, an option agreement, and a right to sell and purchase agreement. The promissory note stated "I/we, jointly and severally, promise to pay to Ronald Kafka, as to an undivided 32% interest ... eighty thousand dollars...." (P. Exh. 11). The $80,000 note was signed by Jack Bellevue personally. (Tr. 106). Kafka received another note, this one captioned "Noted Secured by Deed of Trust" for $420,000. The promissor was SFC, and the note bore Robert's signature. It was Jack, however, who signed Robert's name. A servicing and guarantee agreement for the note was signed by Jack and Robert on behalf of Bellevue Corporation.

SFC purchased the Diamond Heights project in October 1983. About two years later on September 6, 1985, Jack sent Berent a $10,000 check to divide among Berent's SFC clients. Kafka received less than $4000. The check was accompanied by a letter that said it was regarding the "Diamond Heights Note", but the letter did not explain whether the note was the $80,000 note or the $420,000 note. The letter stated that the money was "a credit against the amount owed to each." It went on to say that "[w]e are attempting to market the property and we will forward to you a copy of any legitimate offer. Next week we will discuss resolution of this matter. We would suggest some form of quarterly payments." (R. 80, Exh. 22). No additional payments were forthcoming. SFC held on to the condominium for several years. The last unit in the condominium was sold in 1990.

Kafka sued, seeking reimbursement from Jack Bellevue and Bellevue Corporation for his $160,000 investment in the Benny second mortgage pursuant to personal and business guarantees, Robert Bellevue and Bellevue Corporation for a 32 percent share of the $420,000 SFC note pursuant to personal and corporate guarantees, and Jack Bellevue for a 32 percent share of the $80,000 note pursuant to a personal guarantee. After a bench trial, the district court held that Jack Bellevue personally guaranteed Kafka's share of the $80,000 note and was liable under that guarantee. The district court did not rule in Kafka's favor on the remaining claims.

## II.

■ Neither the parties nor the court identified whether California or Illinois substantive law applies in this case. The district court did not cite any cases in its opinion, and the parties cited cases from both jurisdictions. Federal courts apply the choice of law test applicable in the state in which the court sits. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941); *H.B. Fuller Co. v. Kinetic Systems, Inc.*, 932 F.2d 681, 685 (7th Cir.1991). Because this case was tried by a district court sitting in Illinois, we must apply Illinois choice of law principles. Illinois courts apply the law that the parties understood would govern the case. We have no indication that the parties agreed upon what law would govern. Our next step, then, is to consider which state has the most significant relationship to the contract. *Diamond State Ins. Co. v. Chester–Jensen Co.*, 243 Ill.App.3d 471, 485–87, 183 Ill.Dec. 435, 445–46, 611 N.E.2d 1083, 1093–94 (Ill.App. 1 Dist. 1993) (citing *Hofeld v. Nationwide Life Ins. Co.*, 59 Ill.2d 522, 322 N.E.2d 454 (1975)). To determine which state has the most significant relationship to the contract, we examine the location of the subject matter, the domicile of the parties, and the place of the last act to give rise to a valid contract. *See Diamond State Ins.*, 243 Ill.App.3d at 611, 183 Ill.Dec. at 447, 611 N.E.2d at 1095 (listing factors to consider when applying most

made solely from Partnership assets. No Limited Partner shall have the right to demand property other than cash for his Partnership interest.

significant relationship test). Here, the investment property was located in California; all the defendants were California citizens; the investments were made in California, and the guarantees were made in California if they were made at all. Only Kafka was in Illinois. In these circumstances, California has a more significant relationship to the contract, and therefore its law governs.

■■■ Although we apply California substantive law, we follow federal procedural law. We review the district court's factual findings after a bench trial to determine only if they are clearly erroneous. We review the district court's legal conclusions *de novo*. *Salve Regina College v. Russell*, 499 U.S. 225, 111 S.Ct. 1217, 113 L.Ed.2d 190 (1991).

*A. The Benny second mortgage guarantees:*

■■■ Kafka bears the burden of establishing that Jack verbally gave his personal guarantee for the Benny second mortgage investment. *See Rancho Santa Fe Pharmacy Inc. v. Seyfert*, 219 Cal.App.3d 875, 268 Cal.Rptr. 505 (Cal.App. 4 Dist.1990) (discussing burdens of proof in guarantee cases). After considering the evidence, the district court determined that no oral guarantee had been made. We agree.[4] Four people testified as to whether an oral guarantee existed: Carol and Ronald Kafka, Jack Bellevue, and Art McManus. Although McManus testified that Jack Bellevue personally guaranteed the loan, his testimony was undercut by impeachment. Because of the impeachment, the district court did not rely on his testimony. Although Kafka calls the impeachment "incredibly superficial" and claims the court erred, (Kafka Brief at 20), we believe the district court's decision not to credit McManus' testimony in light of the impeachment was not clearly erroneous. *Anderson v. City of Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). Of the remaining testimony, the district court found that testimony in support of the personal guarantee was not credible. (D.Ct. opn. ¶ 15). After reviewing the trial transcript, we cannot say that the district court's

finding was clearly erroneous. *Stanley Gudyka Sales Co. v. Lacy Forest Products Co.*, 915 F.2d 273, 277 (7th Cir.1990).

As further evidence of the guarantee, Kafka offered the March 12 and July 20 letters. Kafka argues that the March 12 letter illustrates Jack's personal guarantee and Bellevue's corporate guarantee of the Benny second mortgage. We examine the letter to determine if a reasonable investor would interpret it as binding Jack personally and as binding Bellevue Corporation. *Home Fed. Sav. & Loan Ass'n v. Ramos*, 229 Cal.App.3d 1609, 1613, 284 Cal.Rptr. 1, 3 (Cal.App. 4 Dist.1991).

In *Home Fed.*, the question was whether a guarantee signed by the defendant, Ramos, bound Ramos himself or the corporation for whom he was the president. The corporation issued a promissory note that was accompanied by a guarantee. The language of the guarantee unambiguously indicated that Ramos personally guaranteed the note. A dispute later arose about whether the guarantee was personal, because when Ramos signed it, he also signed his corporate title. The signature and corporate designation on the guarantee matched the ones found on the promissory note Ramos executed on behalf of the corporation. The California Court of Appeal held that it did not need to "articulate a blanket rule that a signatory's notation of his corporate capacity can never raise an issue as to the identity of the guarantee." *Id.* The court likened the case to *Sebastian Int'l, Inc. v. Peck*, and acknowledged that finding the guarantee to be corporate, rather than personal, was objectively unreasonable because the corporation was already bound under the terms of the promissory note. *Id.*, *See Sebastian Int'l, Inc. v. Peck*, 195 Cal. App.3d 803, 240 Cal.Rptr. 911 (Cal.App. 2 Dist.1987).

In *Sebastian*, the defendant was the vice president of a company that subleased office space from Sebastian. After the company defaulted on the lease, Sebastian turned to Peck personally for compensation pursuant to a guarantee. The guarantee document

---

4. Jack Bellevuc has not raised a statute of frauds defense, therefore it will not be considered. *See Walton v. City of Red Bluff*, 2 Cal.App.4th 117,

131, 3 Cal.Rptr.2d 275, 284 (Cal.Ct.App.3d Dist. 1992) (discussing waiver of affirmative defenses).

referred only to Peck. It did not refer to the company or Peck's relationship with the company. The signature line of the guarantee, however, included the designation "Vice President" following Peck's name. Peck argued that although the document referred only to him personally, the signature line controlled. He claimed that he had signed the guarantee on behalf of the corporation, and argued that the company was liable under the guarantee, not him personally. The appellate court did not agree. It stated that in some circumstances, a corporate title following a name is merely *descriptio personae*—a term describing the person, rather than the capacity in which the person signed the document. The appellate court held that the signature line did not control when the words of the document referred to Peck alone, and raised no ambiguity as to the identity of the guarantor. *Id.*, 195 Cal. App.3d at 807–809, 240 Cal.Rptr. at 912–14. *Cf. Ricker v. B–W Acceptance Corp.*, 349 F.2d 892 (10th Cir.1965) (benchmark case addressing *descriptio personae* holding that the defendant's inclusion of corporate title after signature will not render personal nature of guarantee uncertain in light of clear contract language).

■■■■ These cases leave open the possibility that if the contract is ambiguous, the corporate title may sway the balance in determining who was bound. The March 12 letter is ambiguous. In *Ramos* and *Sebastian*, the guarantees were clear from the words of the document. In this case, the document was unclear because the letters use the term "we", rather than "me" or "I". The "we" could represent any combination of players: Jack, Robert, or Bellevue Corporation. Further, the letter is written on Bellevue Corporation stationery, but Jack Bellevue's signature line does not bear a corporate title. And unlike *Ramos* and *Sebastian*, the corporation for whom the signatory worked was not already liable under the promissory note. The signature, then, does not help us decipher the document and no other evidence was presented to clarify it further. Moreover, the district court noted that even if the guarantee did exist, Kafka did not produce any evidence of its terms. The July 20 letter states that the guarantee would be the same

as the one stated on "all PMI policies", but no PMI policy was produced (or attached to the letter) that would enumerate those terms. The failure to set out the terms of the guarantee is also fatal to Kafka's claim. *See Colorado Corp. v. Smith,* 121 Cal.App.2d 374, 376, 263 P.2d 79 (Cal.Dist.Ct.App.2d Dist., Div. 3, 1953). The district court concluded that the March 12 letter was too ambiguous to be construed as binding either Jack Bellevue or Bellevue Corporation.

■■■■ Although ambiguity in contracts will generally be construed against the party who drafted the contract, *Cathay Bank v. Lee,* 14 Cal.App. 4th 1533, 1538, 18 Cal. Rptr.2d 420, 423 (4th Dist.1993), Kafka has failed to establish that the letter was a contract. To have an enforceable contract, the parties must exchange consideration. *Rancho Santa Fe Pharmacy, Inc. v. Seyfert,* 219 Cal.App.3d at 878, 268 Cal.Rptr. at 506. Kafka claims that because Jack guaranteed the investment after he could not secure PMI, Kafka did not attempt to secure his own mortgage insurance, and that this forbearance is consideration for the guarantee. *Beverly Hills Nat'l Bank v. Glynn,* 267 Cal. App.2d 859, 73 Cal.Rptr. 808, 813 (Cal.App. 2 Dist.1968).

■■■■ When a guarantee is made at the same time as a promissory note, the guarantee is supported by the same consideration as the note and is enforceable. *Rancho Santa Fe Pharmacy,* 219 Cal.App.3d at 878, 268 Cal.Rptr. at 506. But when a promissory note is given for consideration, and later a guarantee is made for that note, the guarantee lacks consideration and cannot be enforced. *Id., citing Rusk v. Johnston,* 18 Cal.App.2d 408, 63 P.2d 1167 (1937). This rule, like so many others, has an exception: if the express language of the guarantee notes its application to former and current obligations, the guarantee will extend to the earlier loans if proper consideration is given at the time the guarantee is made. *Beverly Hills Nat'l Bank,* 267 Cal.App.2d at 867, 73 Cal.Rptr. at 813. That consideration may be "the forbearance to collect on an obligation previously incurred", *id.,* the consideration Kafka claims was made here. Kafka has

failed, however, to produce evidence of the consideration.

Production of evidence of consideration and the burden of proof was the focus in *Rancho Santa Fe Pharmacy.* In that case, the pharmacy sold an associated liquor store to another business. The sale documents did not require that the defendants, the Seyferts, personally guarantee the buyer's debt. Nonetheless, before the sale was complete the Seyferts executed written, personal guarantees. The buyer failed to make its payments, and the pharmacy turned to the Seyferts to offset the shortfall. When the Seyferts failed to uphold their guarantees, they cited lack of consideration in defense of their actions. The pharmacy claimed that consideration was the sale, because the sale hinged on assertions of the Seyferts' personal guarantees.

The court looked at California cases concerning debtor-creditor relationships and held that although a plaintiff produces a written document that activates a presumption that consideration was exchanged, the plaintiff maintains the burden of proving that consideration was given in the face of contrary evidence. *Id.* 268 Cal.Rptr. at 510. In this case, even if we were to construe the letter as evidence of a written guarantee, the defendants have sufficiently challenged the presumption that the writing was supported by consideration, and Kafka has not produced any evidence to support his forbearance claim. He does not fulfill his burden of proving a contract existed.

The district court correctly determined that as a matter of law, no guarantee existed between Kafka and Jack Bellevue and Bellevue Corporation for the Benny second mortgage investment.

*The $420,000 note:*

■ Kafka claims that because Robert Bellevue's name appears on the $420,000 promissory note, Robert is personally liable for Kafka's 32 percent interest in that note. He also claims that Bellevue Corporation has a moral obligation to repay Kafka's investment. First, we consider Robert's liability. To do this, we do not need to decide if Jack had authority to sign Robert's name on the $420,000 promissory note. Instead we can look at one pivotal fact: the $420,000 note was executed on behalf of the SFC partnership. Robert Bellevue and Bellevue Corporation are the general partners of SFC, (P.A. ¶ 5.A.), and they are insulated from personal liability for partnership debts pursuant to paragraph 9.D.(5) of the SFC partnership agreement. Kafka tries to detour paragraph 9.D.(5) by claiming that when Robert Bellevue and Bellevue Corporation raised the paragraph as a defense, they needed to show that the partnership had enough assets to settle its debts absent personal liability. Kafka did not present the argument in the district court, and we will not consider it here. *United States v. Rode Corp.,* 996 F.2d 174, 179 (7th Cir., 1993). He cannot collect from Robert Bellevue or Bellevue Corporation for the losses he suffered under the $420,000 promissory note.

*Additional interest:*

■ Kafka seeks additional interest on the money owed on the promissory note guarantee given Jack Bellevue. The promissory note states the repayment terms of Kafka's 32 percent share of the $80,000 note. The promissory note states that interest accrues from the "close [*sic*] San Francisco Condo's LTD Partnership on unpaid principal at the rate of 12 percent per annum; principal and interest payable 5 years from close of San Francsco [*sic*] Condo's LTD Partnership." (R. 80, Exh. 15). Kafka argues that the "close" to which the $80,000 promissory note referred meant the closing of the SFC's original purchase of the Diamond Heights condominium from Cathedral Mortgage. Kafka's reasoning to support this construction of "close" is convoluted.

We find Kafka's reasoning unpersuasive and believe it contradicts the language and purpose of the partnership agreement. The words contained in the promissory note are clear. The "close of San Francisco Condo's LTD Partnership" does not convey any inkling that it means the real estate closing associated with SFC's purchase of the Diamond Heights project. It seems assuredly to refer to the close, or dissolution, of the SFC partnership. Moreover, repayment of the $80,000 promissory note, which reflects

at least a portion of the investors share in the partnership, upon its dissolution is logical in light of the partnership's purpose. That purpose, as set forth in the partnership agreement, was not only to purchase the condominium, but "to manage and rent the condominium and to hold them [*sic*] for investment." (P.A. ¶ 4). The SFC partnership dissolved "upon the earlier to occur of (i) on January 31, 2004, (ii) sale of all of the Partnership's assets, or (iii) the vote of the Limited Partners as set forth in Section 6.E." (P.A. ¶ 9.A.). To repay the note before Bellevue Corporation could realize a profit from the investment is illogical. Rather, repaying the $80,000 promissory note after the Diamond Heights units were resold (ostensibly for a profit) is logical, and is consistent with the "close of the San Francisco Partnership" language.

■ Because the district court determined that interest on the money from the $80,000 promissory note was to accrue at the close of the partnership, the court next considered on what date that occurred. The parties did not present any evidence of when the last condominium was sold, which would signal the "close" of the partnership pursuant to the partnership agreement. In light of this dearth of evidence, the district court looked to the September 6, 1985 check from Bellevue Corporation to Attorney Berent, who represented some of the SFC investors. The district court determined that the check was probably the amount of the investors' interest in SFC partnership, and therefore the letter and check came at the close of the partnership. The court used that date as a benchmark, added five years onto it (pursuant to the language of the $80,000 promissory note), and concluded that the interest should be calculated from September 6, 1990. The district court was forced to use imperfect evidence to reach its decision, but we find no error in its calculation of the interest from that date.

### III.

The district court decision is AFFIRMED.