659 A.2d 1295

AMERICAN MOTORISTS INSURANCE COMPANY

v.

ARTRA GROUP, INC.

No. 84, Sept. Term, 1994.

Court of Appeals of Maryland.

June 22, 1995.

562

Michael W. Morrison (Tressler, Soderstrom, Maloney & Priess, Chicago, IL, Deborah L. Robinson, Kenny, Vettori & Robinson, P.A., Baltimore), all on brief, for petitioner.

Richard T. Pfohl (Wiley, Rein & Fielding, on brief), Washington, DC, amicus curiae.

Kathleen Gallogly Cox (Venable, Baetjer and Howard, LLP, on brief), Towson, for respondent.

Argued before ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, BELL and RAKER, JJ., and JOHN F. McAULIFFE, Judge (Retired and Specially Assigned).

CHASANOW, Judge.

This case arises out of a declaratory judgment action commenced by American Motorists Insurance Company ("American Motorists") against ARTRA Group, Inc. ("ARTRA") in the Circuit Court for Baltimore City on April 29, 1992. The facts underlying the commencement of that declaratory judgment action are as follows.

In 1980, Sherwin–Williams Company ("Sherwin–Williams") purchased from ARTRA a paint manufacturing factory located in Baltimore City on Hollins Ferry Road (the "Hollins Ferry

Site").[1] After the sale, the Maryland Department of the Environment required that Sherwin–Williams investigate and remedy hazardous waste contamination in the soil and ground-water at the Hollins Ferry Site. In December, 1991, Sherwin–Williams filed suit in the United States District Court for the District of Maryland against ARTRA and other previous owners of the Hollins Ferry Site, seeking recovery for the costs of investigation and remediation of the Site. In its complaint, Sherwin–Williams alleged that "numerous spills of hazardous substances and hazardous wastes were released at the Site during and as a result of regular operations of the plant." The complaint further alleged that hazardous sub-stances and hazardous wastes were released through dis-charge into the storm drainage system, through improper filling of underground storage tanks, and through the aban-donment of underground storage tanks at the Hollins Ferry Site.

After receiving the Sherwin–Williams complaint, ARTRA requested that American Motorists defend and indemnify AR-TRA in the Sherwin–Williams suit. American Motorists had issued a series of nine comprehensive general liability policies to ARTRA and its predecessor companies, covering a period from April 1, 1976 through April 1, 1985. ARTRA and its predecessor companies were headquartered in Northfield, Illi-nois. American Motorists was also headquartered in Illinois and the policies were all countersigned on behalf of American Motorists in Illinois. Each policy contained a pollution exclu-sion which limited the scope of coverage. This exclusion precluded coverage for:

> "bodily injury or property damage arising out of the dis-charge, dispersal, release or escape of smoke, vapors, soot,

---

1. As set forth in Sherwin–Williams's complaint in the underlying suit, the plant purchased by Sherwin–Williams was operated by a company known as Baltimore Paint and Color Works from 1946 through 1960. In 1960, the Site was purchased by Baltimore Paint and Chemical Corporation, which later merged into ELT, Inc. in 1975. In 1977, ELT, Inc. changed its name to Dutch Boy, Inc. In 1981, Dutch Boy, Inc. changed its name to ARTRA.

fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental."

American Motorists had also issued a Comprehensive Catastrophe Umbrella Policy to ARTRA which was in effect from 1976 to 1978. This umbrella policy contained similar pollution exclusion language.

American Motorists refused ARTRA's request to defend and indemnify ARTRA, based on the pollution exclusions contained in the applicable policies.[2] American Motorists then filed a complaint for declaratory judgment in the Circuit Court for Baltimore City, seeking a determination by that court that, under the applicable insurance policies, American Motorists owed no duty to defend or indemnify ARTRA in the Sherwin–Williams suit.

ARTRA filed an answer to the complaint for declaratory judgment, arguing that at a minimum, American Motorists owed a duty to defend ARTRA in the Sherwin–Williams suit because the allegations of the Sherwin–Williams complaint gave rise to a potentiality of coverage under the applicable policies. ARTRA subsequently filed a motion to dismiss arguing that key factual issues determinative of the duty to indemnify were intertwined with facts to be determined at trial. At the hearing on its motion to dismiss, ARTRA asserted that, under the doctrine of *lex loci contractus*, Illinois law controlled the substantive issues and that, under *Outboard Marine v. Liberty Mut. Ins.*, 154 Ill.2d 90, 180 Ill.Dec. 691, 607 N.E.2d 1204 (1992), Illinois law holds the pollution exclusion at issue to be ambiguous. Such ambiguity, ARTRA argued,

---

**2.** In addition to the pollution exclusion, American Motorists raised several other defenses which it claimed precluded it from being obligated to defend and indemnify ARTRA. These defenses have not been raised on appeal and are not relevant to our resolution of the issues before us.

must under Illinois law be construed in favor of the insured. In response, American Motorists moved for summary judgment and argued that the court should apply the principle of *renvoi* and that a Maryland court should look to the entire body of Illinois law, including Illinois conflict of law principles and determine whether Illinois would apply Maryland law for a decision on the coverage issues presented. American Motorists argued that, in the instant case, Illinois would apply the law of Maryland to the underlying dispute since Illinois conflict of law rules apply the "most significant contacts" test of Restatement (Second) Conflict of Laws §§ 188 and 193 (1971). Section 193 provides that the validity and rights created by a casualty insurance contract are determined by:

"the local law of the state which the parties understood was to be the principal location of the insured risk during the term of the policy, unless with respect to the particular issue, some other state has a more significant relationship ... to the transaction and the parties, in which event the local law of the other state will be applied."

Thus, American Motorists argued because, under § 193, the validity of and rights created by an insurance policy are determined by the law of the state where the risk is located and because the risk of pollution was located in Maryland, Illinois choice-of-law rules would dictate the application of Maryland law to the substantive issues in the case.

At argument on American Motorists's motion for summary judgment, the trial judge (Ward, J.) noted that the place of contracting was Illinois. Nonetheless, the trial judge held that Maryland substantive law would apply both because Illinois would itself apply Maryland law and because of Maryland's public policy with regard to environmental issues. The court found that under the Court of Special Appeals's decision in *Bentz v. Mutual Fire*, 83 Md.App. 524, 575 A.2d 795 (1990), the terms "sudden" and "accidental" in the language of the pollution exclusions were unambiguous and there was no potentiality for coverage under the American Motorists policies. The court therefore granted American Motorists's mo-

tion for summary judgment on the declaratory judgment action and denied ARTRA's motion to dismiss.

ARTRA appealed to the Court of Special Appeals which reversed and held that the trial court was incorrect both as to choice of law and the potentiality of coverage. *See ARTRA Group v. American Motorists,* 100 Md.App. 728, 741–42, 642 A.2d 896, 902–03 (1994). The Court of Special Appeals held that the doctrine of *renvoi* was not accepted in Maryland, nor had Maryland accepted Restatement § 193's significant relationship analysis. *ARTRA,* 100 Md.App. at 736–37, 642 A.2d at 900. The Court of Special Appeals held that Maryland followed the doctrine of *lex loci contractus* and that the Maryland court should therefore look to the *substantive* law of Illinois, but not to Illinois's choice-of-law rules. *ARTRA,* 100 Md.App. at 736–38, 642 A.2d at 900–02. The court further held that although the Maryland legislature had "expressed a strong public policy regarding the protection of the land and citizens of Maryland from pollution ... Maryland has *no* strong public policy regarding *who pays* for the clean-up. That issue is controlled by the contract between insured and insurer." *ARTRA,* 100 Md.App. at 739, 642 A.2d at 901 (emphasis in original). With regard to the duty to defend, the intermediate appellate court held that under either Maryland or Illinois law, "there are allegations [in the Sherwin–Williams complaint] that at least some of the pollution at the Site occurred under circumstances that might well be deemed to be 'sudden and accidental.'" *ARTRA,* 100 Md.App. at 740, 642 A.2d at 902. Thus, a potentiality for coverage existed. *Id.* As to the duty to indemnify, the court held that there were facts which remained to be determined at trial as to whether the contamination that occurred was sudden and accidental and that if in fact the contamination was found at trial to be sudden and accidental, American Motorists would have to indemnify ARTRA. *ARTRA,* 100 Md.App. at 741, 642 A.2d at 903. American Motorists petitioned for a writ of certiorari, which we granted to consider the issues raised in the instant case.

## I.

In determining the issues presented in the instant case, we initially point out that, for the purpose of this opinion, we must assume that Illinois choice-of-law rules would dictate the application of Maryland law to the substantive issues in the present case. In granting summary judgment, the trial judge apparently found Maryland law applicable both because Illinois would itself apply Maryland law and because of Maryland's strong public policy on the issue. In its brief before the Court of Special Appeals, ARTRA acknowledged that the trial judge "ruled that Illinois would apply Maryland law for purposes of conflict of law analysis in interpreting issues of coverage" and American Motorists agreed with the trial judge's finding, contending that "Illinois would apply the law of Maryland in resolving the declaratory judgment case." The Court of Special Appeals assumed that Illinois would apply Maryland law "because of [Illinois's] own law regarding choice of law." *ARTRA,* 100 Md.App. at 738, 642 A.2d at 901. In its petition for certiorari, American Motorists began its *renvoi* argument with the recognition that the trial judge had found that Illinois choice-of-law rules would lead to the application of Maryland law:

"In its analysis, the circuit court concluded that Maryland law applied under the choice-of-law doctrine known as *renvoi.* Under this doctrine, a court applies the law of the state where the insurance contract was entered into unless that state, under its own internal choice-of-law rules, would apply Maryland law. The insurance contracts at issue were entered into in Illinois. However, because Illinois would apply Maryland law—out of recognition that Maryland is the location of the risk and has the most significant public policy interest in insurance coverage issues involving clean up of polluted land within its borders—the circuit court applied Maryland law."

ARTRA did not dispute this assertion in its answer to the petition for certiorari, nor did it file a cross petition raising the issue that the trial judge was wrong in concluding that Illinois choice-of-law rules would lead to the application of Maryland

law. *See* Maryland Rule 8-131(b) ("[T]he Court of Appeals ordinarily will consider only an issue that has been raised in the petition for certiorari or any cross-petition and that has been preserved for review by the Court of Appeals."). That issue is therefore not properly before us and we must assume for purposes of this opinion that the trial court was correct in finding that Illinois would apply Maryland law.

American Motorists's first suggestion is that we recognize that the rule of *lex loci contractus* is antiquated and should be abandoned in favor of some form of the more modern approaches to choice of law such as the one advocated by Restatement (Second) Conflict of Laws. These "modern" choice-of-law approaches differ slightly in their methodology, but generally examine the contacts with the jurisdictions involved and attempt to apply the law of the jurisdiction with the most significant interest in, and relationship to, the contractual issue before the court. We shall collectively refer to these approaches with the Restatement term "most significant relationship" test. No attempt will be made to discuss and differentiate the various, rather similar approaches, but we shall briefly discuss the Restatement test. Based on our holding on the *renvoi* issue, we need not give any consideration to the intriguing question of whether Maryland's traditional *lex loci contractus* test should be abandoned in favor of one of the "modern" most significant relationship tests. American Motorists's second suggestion is that we engraft the doctrine of *renvoi* to our body of conflict of law rules. We need not determine today how far we should go in incorporating the doctrine of *renvoi*, but we do adopt a limited form of *renvoi* which will direct the application of Maryland law to resolve the substantive issues in the instant case.

## THE RESTATEMENT (SECOND) CONFLICT OF LAWS

The Restatement's most significant relationship test was adopted by the Restatement (Second) Conflict of Laws in 1971, although preliminary drafts containing the approach were circulated as early as 1953. *See* 16 Am.Jur.2d *Conflict of Laws* § 83, at 140 n. 89 (1979). It is generally referred to as

one of the "modern approaches," and it applies the law of the place having the most significant relationship to the contract issue in dispute. This "most significant relationship" test is set forth in Restatement § 188. Section 188 states:

"The rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties...."

Section 188 also sets forth the factors that should be considered in determining what state has the most significant relationship. These include the place of contracting, the place of negotiation of the contract, the place of performance, the location of the subject matter of the contract, and the domicil and place of business of the parties. Section 193 further narrows the most significant relationship test in the context of fire, surety or casualty insurance contracts and finds that the state where the parties understood to be the principal location of the insured risk typically will be the state with the most significant relationship.

■ This modern test embodied by the Restatement contrasts with the rule of *lex loci contractus*, which requires that the construction and validity of a contract be determined by the law of the place of making of the contract. *See Allstate Ins. Co. v. Hart,* 327 Md. 526, 529, 611 A.2d 100, 101 (1992); *Kramer v. Bally's Park Place,* 311 Md. 387, 390, 535 A.2d 466, 467 (1988). The Restatement test sacrifices some of the certainty, simplicity, and predictability of the *lex loci contractus* rule in favor of a rule which gives the jurisdiction with the strongest interest in the litigation the most control over the outcome of the litigation. It also may be based, at least in part, on an assumption that the parties to a contract might expect that the law applied to contract issues should be the law of the jurisdiction with the predominant contacts and concern in the outcome. *See* 16 Am.Jur.2d *Conflict of Laws* § 83, at 141 (1979) ("It is said that the modern approach ... enabl[es] the court, not only to reflect the relative interests of the several jurisdictions involved, but also to give effect to the

probable intention of the parties and consideration to the best practical result.").

In the instant case, both parties cited Restatement §§ 188 and 193 in their briefs, agreeing that "Illinois adheres to the most significant interest approach" and that "[p]ursuant to Restatement § 193, the rights created under an insurance contract are determined by the local law of the state which the parties understood was to be the principal location of the insured risk." *See Diamond State Ins. v. Chester-Jensen Co.*, 243 Ill.App.3d 471, 183 Ill.Dec. 435, 611 N.E.2d 1083 (1993); *KNS Companies, Inc. v. Federal Ins. Co.*, 866 F.Supp. 1121 (N.D.Ill.1994).

In *Diamond State, supra,* the Illinois Appellate Court held that even though the insured was a Pennsylvania corporation, both the insured and the insurer were principally located in Pennsylvania, and the insurance policies were delivered to the insured in Pennsylvania, Pennsylvania law did not govern the coverage issues. 183 Ill.Dec. at 444–45, 611 N.E.2d at 1094–95. Rather, the court applied Illinois law because the coverage issues concerned a suit against the insured over a defective thermal bank system which the insured had installed in a building in Illinois and, thus, the risk was located in Illinois. *Diamond State,* 183 Ill.Dec. at 445, 611 N.E.2d at 1095. The court noted that:

> "While ... section [193] does not preclude considerations of other factors in a choice of law analysis, the 'location of the insured risk will be given greater weight than any other single contact in determining the state of applicable law provided that the risk can be located, at least principally in a single state.'"

*Id.* (quoting Restatement (Second) Conflict of Laws § 193, cmt. b, at 611 (1971)).

Recently, in *KNS Companies, supra,* a federal court in Illinois applied Indiana law in an environmental coverage case involving a polluted waste site in Indiana, even though the insured in that case was an Illinois corporation. 866 F.Supp. at 1125. The court, applying Illinois's choice-of-law rules,

relied on *Diamond State* in concluding that where a policy potentially covers risks in multiple states, the law of the state where the pollution took place should govern. The court held:

> "Although KNS is an Illinois-based corporation, all of the insurers' policies provided it with coverage extending to all of its operations, and the claim at issue stems from the United States Environmental Protection Agency's having asserted KNS' responsibility for the payment of costs of cleaning up an Indiana site where KNS' solvent was treated by another company (a licensed hazardous waste treatment facility). Thus the assertedly insured risk has its situs in Indiana, and *Diamond State* calls for the application of Indiana law."

*KNS Companies*, 866 F.Supp. at 1125.

Despite growing acceptance elsewhere, Maryland courts have never applied the "most significant relationship" test embodied by the Restatement. We have, however, cited with approval other provisions of the Restatement. In *Kronovet v. Lipchin*, 288 Md. 30, 415 A.2d 1096 (1980), we cited with approval Restatement § 187 in determining whether we would enforce the contracting parties' choice-of-law clause contained in a contract. *See also National Glass v. J.C. Penney*, 336 Md. 606, 650 A.2d 246 (1994) (applying § 187 to analyze the validity of a choice-of-law clause). Section 187, however, concerns whether a choice-of-law clause contained in a contract is to be enforced and provides that such a clause will be honored unless either: 1) the state whose law is chosen has no substantial relationship to the parties or the transaction; or 2) the strong fundamental public policy of the forum state precludes the application of the choice-of-law provision. *See* Restatement (Second) Conflict of Laws § 187. The present case involves no such choice-of-law provision.

We have also cited the Restatement (Second) Conflict of Laws on other occasions. *See, e.g., Eckard v. Eckard*, 333 Md. 531, 545, 636 A.2d 455, 462 (citing § 102 regarding the enforcement of a foreign deed), *cert. denied*, — U.S. —, 115 S.Ct. 77, 130 L.Ed.2d 31 (1994); *Mack v. Mack*, 329 Md. 188,

198–99, 618 A.2d 744, 749 (1993) (citing § 79 regarding jurisdiction to appoint a guardian over the person); *Rein v. Koons Ford,* 318 Md. 130, 135, 567 A.2d 101, 103 (1989) (citing § 89 regarding a foreign penal cause of action); *Johnson v. Searle,* 314 Md. 521, 525, 552 A.2d 29, 30 (1989) (citing § 84 for the principle of *forum non conveniens* ); *In re Lynn M.,* 312 Md. 461, 471, 540 A.2d 799, 804 (1988) (citing § 14 regarding domicile). We have never, however, looked to the Restatement's "most significant relationship" test to determine what law would govern absent a choice-of-law provision contained in the contract.

Absent a choice-of-law provision in the contract, our courts have applied the rule of *lex loci contractus* to matters regarding the validity and interpretation of contract provisions. *See Allstate,* 327 Md. at 529, 611 A.2d at 101; *Kramer,* 311 Md. at 390, 535 A.2d at 467. We have recognized an exception to the application of *lex loci contractus* when application of a foreign jurisdiction's law would be contrary to a strong public policy of this State, *see Bethlehem Steel v. G.C. Zarnas & Co.,* 304 Md. 183, 498 A.2d 605 (1985); *National Glass, supra,* but we do not find this exception applicable to the facts of the instant case.[3] Although American Motorists asks us to abandon our adherence to *lex loci contractus,* we need not consider such a sweeping change, for we adopt a limited application of *renvoi* which permits us to apply Maryland law where the application of *lex loci contractus* indicates that the foreign jurisdiction would apply Maryland law to the substantive issues of the controversy.

---

**3.** We noted in *Bethlehem Steel v. G.C. Zarnas & Co.,* 304 Md. 183, 498 A.2d 605 (1985) that "merely because Maryland law is dissimilar to the law of another jurisdiction does not render the latter contrary to Maryland public policy.... Rather, for another state's law to be unenforceable, there must be 'a strong public policy against its enforcement in Maryland.' " 304 Md. at 189, 498 A.2d at 608 (quoting *Texaco v. Vanden Bosche,* 242 Md. 334, 340–41, 219 A.2d 80, 84 (1966)). Regardless of Maryland's public policy with regard to environmental issues, as noted by the trial court, we find no evidence in our case law, statutes, or regulations indicating that the reference to Illinois law dictated by the application of *lex loci contractus* would violate a strong Maryland public policy.

## RENVOI

■■■ *Renvoi* is a French word meaning "send back" or "remit." It has been suggested that the doctrine of *renvoi* was formulated to avoid the harshness of the traditional common law choice-of-law principles. Rhoda S. Barish, Comment, *Renvoi and the Modern Approaches to Choice-of-Law*, 30 Am.U.L.Rev. 1049, 1061–62 (1981) (hereinafter "Barish"). The doctrine of *renvoi* is basically that, when the forum court's choice-of-law rules would apply the substantive law of a foreign jurisdiction to the case before the forum court, the forum court may apply the whole body of the foreign jurisdiction's substantive law including the foreign jurisdiction's choice-of-law rules. Barish, 30 Am.U.L.Rev. at 1062. If, in applying *renvoi* principles, the foreign jurisdiction's conflict of law rules would apply the forum's law, this reference back of the forum to its own laws is called a remission. *Id.* That is what is involved in the instant case. If the choice-of-law rules of the foreign jurisdiction whose laws the forum would apply refers the forum court to the law of a third jurisdiction that is called a transmission. *Id.* How we would in the future treat a transmission is not before this court. It has been suggested that *renvoi* could have the danger of creating an endless cycle. In the instant case, Maryland choice-of-law rules apply the doctrine of *lex loci contractus* and, pursuant thereto, apply Illinois law. In applying Illinois law, we also adopt Illinois choice of law, which would apply Maryland law, which applies Illinois law, and back and forth. What breaks the endless cycle? As shall be seen, we adopt a limited form of *renvoi* in the instant case that does not have the endless cycle.

A persuasive case for adopting *renvoi* is made by two law school professors in their text on conflict of laws.

"Early commentators: and most of the cases rejected the more general use of renvoi. The reasons offered in the case law include that renvoi is (1) a manipulative device to explain the application of a different law, that (2) the forum's conflicts rules should not be displaced by those of another jurisdiction, and that (3) the 'circular process' of renvoi would add to the confusion in choice of law.

None of these objections is persuasive. The first two objections overlook one of the important objectives of conflicts law: to minimize the effect that litigation was commenced in this rather than in another forum and to achieve, to the greatest extent possible, uniformity of decisions. The third objection—the circularity of renvoi—assumes that both jurisdictions' choice-of-law rules refer to each other and that a reference back to the forum would trigger the process anew. The answer is two-fold. Often, there will not be any circularity. Thus, in cases of transmission, it may well happen that A, the forum refers to B, the latter to C, and C to itself. In this situation the use of renvoi by A would assure that all three courts would reach the same result. Blind adherence by A to its own conflicts rules would produce a different result in A than in B and C. Circularity also does not happen if only A, but not B, employs renvoi. In this case, A refers to B, B refers to A and would not accept a reference back: A law applies.

Nevertheless, a mechanical use of renvoi by all concerned jurisdictions could theoretically produce the problem of circularity. In this case, however, it is suggested that the forum accept the reference to its own law, refer no further, and apply its own law. This is the practice of most jurisdictions that do employ renvoi. This is good policy: the foreign conflicts rule itself discloses a disinterest to have its own substantive law applied, indeed it recognizes the significance of the forum's law for the particular case; the case therefore probably presents a 'false conflict.' Furthermore, since uniformity in result would not otherwise be achieved in these circumstances, ease in the administration of justice is furthered by the application of forum law rather than by the use of foreign law." (Footnotes omitted).

Eugene F. Scoles & Peter Hay, *Conflict of Laws* § 3.13, at 67–70 (2d ed. 1992).

Where the forum would apply the law of the foreign jurisdiction and the foreign jurisdiction would apply the law of the forum, it would seem that the balance should tip in favor of the jurisdiction with the most significant contacts or, if not to

the jurisdiction with the most significant contacts, then for ease of application and to prevent forum shopping, the law of the forum should be applied. In the instant case, Maryland is apparently the jurisdiction with the most significant contacts as well as the forum. Maryland courts should, in applying Illinois law, apply Illinois's most significant relationship choice-of-law rule and follow the law an Illinois court would follow if the case was instituted in Illinois—Maryland law. Thus, whether suit was filed in Maryland or Illinois, Maryland law would govern the contract.

In our situation, there may not even be a real "conflict." In the absence of some reason to apply foreign law, Maryland courts would ordinarily apply Maryland substantive law, and there is no reason to apply the substantive law of a foreign state if that foreign state recognizes that Maryland has the most significant interest in the issues and that Maryland substantive law ought to be applied to the contract issues. In *Bethlehem Steel*, we recognized that it makes no sense for Maryland courts to apply the law of another state when that state would apply Maryland law. In *Bethlehem Steel*, we were asked to construe a contract, executed in Pennsylvania, which provided for indemnification of the indemnitee's sole negligence. Maryland law considered such a provision to be void and unenforceable as against public policy, but the provision was permitted under Pennsylvania law. *Bethlehem Steel*, 304 Md. at 187–88, 498 A.2d at 608. In finding that Maryland's strong public policy would override the application of Pennsylvania law under *lex loci contractus,* we noted that Pennsylvania did not have a strong interest in applying its law to the transaction at issue. *Bethlehem Steel*, 304 Md. at 191 n. 5, 498 A.2d at 609 n. 5. We recognized that Pennsylvania's conflict of law principles applied the law of the state with the most significant contacts to the transaction and that under this principle, "had suit on the indemnity agreement been brought in Pennsylvania, the Pennsylvania court would likely have decided the issue according to Maryland law." *Id.* We further found that "it would be ironic if, ... we were to hold that principles of comity require us to apply Pennsylvania law

and ignore that state's conflict of law principles." *Id.* In effect, because Pennsylvania's conflict of law rules led to the application of Maryland law, there was no real "conflict" because both Maryland and Pennsylvania preferred that the substantive law of Maryland be applied to the controversy.

The use of *renvoi* where no "real" conflict exists was predicted by Judge Motz in *Travelers Indem. Co. v. Allied-Signal, Inc.,* 718 F.Supp. 1252 (D.Md.1989). In *Travelers,* Judge Motz applied Maryland choice-of-law principles in a case concerning insurance coverage for pollution-related clean-up costs. The contracts in question were formed in New York and New Jersey. *Travelers,* 718 F.Supp. at 1253. Despite the rule of *lex loci contractus,* the court used the doctrine of *renvoi* and predicted that Maryland courts would apply Maryland law to the contracts because New York and New Jersey would apply Maryland law to the contract issues. *Travelers,* 718 F.Supp. at 1254–55. The court noted:

> "This use of what is known as the doctrine of *renvoi* to pierce through 'false conflicts' is widely endorsed. Commentators have recognized it as a sensible approach which enhances uniformity and accommodates situations where 'the foreign conflicts rule itself discloses a disinterest to have its own substantive law applied and a recognition of the significance of the forum's law.'"

*Travelers,* 718 F.Supp. at 1254 (quoting Eugene F. Scoles & Peter Hay, *Conflict of Laws* § 3.13, at 69–70 (1984)).

■ ARTRA contends that failure to apply a strict *lex loci contractus* test in the instant case would be unfair because ARTRA allegedly had some expectation that Illinois law would govern these insurance contracts. This contention is unpersuasive, at best, because if American Motorists had filed its declaratory judgment action in Illinois then, as was held below, Maryland law would have been applied to the coverage issues, since Illinois applies the law of the state with the most significant contacts and the location of the risk, *i.e.,* Maryland. For consistency and to prevent forum shopping when the action is filed in Maryland, our courts also ought to apply

Maryland substantive law when the place of contracting would apply Maryland law to resolve the dispute had suit been filed in that jurisdiction.

It is axiomatic that Maryland law is Maryland law because our courts and legislature believe the rules of substantive law we apply are the best of the available alternatives. From this fundamental principle, it is safe to assume our courts would prefer to follow Maryland law unless there is some good reason why Maryland law should yield to the law of a foreign jurisdiction. Our own substantive law is not only more familiar to and easier for Maryland judges to apply, but there has been a legislative or judicial determination that it is preferable to the available alternatives. Sometimes, however, there are good reasons why our courts should, and do, apply the law of a foreign jurisdiction.[4] First, if Maryland does not defer to other states when they have a significant interest, they might not defer to Maryland when we have a significant interest. Second, we should discourage forum shopping and strive for some uniformity and predictability in resolving conflict of law issues regardless of where suit is filed. For simplicity, predictability, and uniformity in contract law, Maryland courts have, as have a majority of other state courts, followed the rule of *lex loci contractus* and have applied the substantive law of the place of contracting. In declining to apply Maryland law to a contract made in another state, we do so not because we deem the law of the other state preferable to Maryland law, but because our preference for Maryland law is outweighed by considerations of simplicity, predictability and

---

4. In *Hansford v. District of Columbia*, 329 Md. 112, 130, 617 A.2d 1057, 1065, *cert. denied*, —— U.S. ——, 113 S.Ct. 2997, 125 L.Ed.2d 690 (1993), a case dealing with our jurisdiction over a tort suit against the District of Columbia, we quoted from the Supreme Court's decision in *Gulf Offshore v. Mobil Oil Corp.*, 453 U.S. 473, 101 S.Ct. 2870, 69 L.Ed.2d 784 (1981), in which the Court noted that " '[t]he judiciary power of every government looks beyond its own local or municipal laws, and in civil cases lays hold of all subjects of litigation between parties within its jurisdiction, though the causes of dispute are relative to the laws of the most distant part of the globe.' " 453 U.S. at 481, 101 S.Ct. at 2877, 69 L.Ed.2d at 793 (quoting The Federalist No. 82, at 514 (Alexander Hamilton) (H. Lodge ed., 1908)).

uniformity. Where, however, the place of contracting applies Maryland law, then simplicity, predictability, and uniformity would be better achieved if Maryland courts followed the conflict of law rule of the place of contracting and apply Maryland law. In that case, there would be uniformity in choice of law regardless of in which jurisdiction suit was filed, and where, as in the instant case, suit was filed in Maryland, then Maryland courts would be applying Maryland law.

■ The limited *renvoi* exception which we adopt today will allow Maryland courts to avoid the irony of applying the law of a foreign jurisdiction when that jurisdiction's conflict of law rules would apply Maryland law. Under this exception, Maryland courts should apply Maryland substantive law to contracts entered into in foreign states' jurisdictions in spite of the doctrine of *lex loci contractus* when:

1) Maryland has the most significant relationship, or, at least, a substantial relationship with respect to the contract issue presented; and

2) The state where the contract was entered into would not apply its own substantive law, but instead would apply Maryland substantive law to the issue before the court.

■ Our holding that Maryland's adherence to *lex loci contractus* must yield to a test such as Restatement (Second) Conflict of Laws § 188 when the place of contracting would apply Maryland law pursuant to that test is not a total jettisoning of *lex loci contractus*.[5] We do note, however, that

---

5. At least one author has recognized that a jurisdiction may maintain its adherence to the rule of *lex loci contractus* while nonetheless recognizing the choice-of-law rules of an interested jurisdiction:

"Many states using the traditional rules simply have not switched over to a more modern approach. By looking at the choice-of-law rule of another concerned jurisdiction, a court adhering to the traditional approach may be enlightened. Even if a state has recently reaffirmed its commitment to a traditional approach, giving some deference to how the case would have been decided in another concerned court improves interstate relations by demonstrating respect for the foreign jurisdiction's whole law." (Footnote omitted).

there appears to be growing support for substituting an approach such as Restatement (Second) Conflict of Laws § 188 for the more traditional approach of *lex loci contractus* in light of modern technology. *See generally* 16 Am.Jur.2d *Conflict of Laws* § 83, at 139–43 (1979). The traditional justification for *lex loci contractus* is that the rule affords contracting parties certainty and probability as to what law will govern. *See* Herbert F. Goodrich & Eugene F. Scoles, *Conflict of Laws* § 106, at 201 (4th ed. 1964) ("[T]he rules that a contract was governed by the place where it was made gained an ascendancy because of its believed certainty."). With modern technology and modern business practices, the place of contracting becomes less certain and more arbitrary. As the court in *Johnson Matthey v. Pa. Mfrs.' Ass'n*, 250 N.J.Super. 51, 593 A.2d 367 (App.Div.1991), aptly noted:

"In these days of multistate insurers, multistate insureds, and instantaneous interstate transmission of voice and document, it is not easy to identify a state of contracting. A Delaware company, for example, secures a casualty insurance policy for a New Jersey site, among others, through a Philadelphia agent from an insurer with a Hartford home office that retains final underwriting approval on large policies. The handshake deal for the insurance is made over lunch in Manhattan. Choosing a *locus contractu* in such a case would be a difficult and perhaps pointless exercise. Pointless, because there is nothing about the choice that tells very much about the insurance transaction involved."

593 A.2d at 372. Another court noted:

"There are some cogent reasons for not paying blind obeisance to the authority of the place of contracting in this day when ease of transportation and communication virtually erase state boundaries as commercial limitations. The *lex loci contractus* rule is not universally recognized and has been criticized in that it frequently elevates fortuitous and

Rhoda S. Barish, Comment, *Renvoi and the Modern Approaches to Choice-of-Law*, 30 Am.U.L.Rev. 1049, 1075–76 (1981).

insignificant circumstances to crucial importance in establishing controlling law."

*Cochran v. Ellsworth,* 126 Cal.App.2d 429, 272 P.2d 904, 908 (1954).

Our case law gives some indication that our courts can give flexibility to our traditional choice-of-law rules.[6] Perhaps some movement away from rigidly following the rule of *lex loci contractus* is indicated by our adopting Restatement (Second) Conflict of Laws § 187 and giving deference to the contracting parties' choice of applicable law. *See, e.g., National Glass, supra; Kronovet v. Lipchin, supra.* We have, in effect, allowed the parties in their contract to select the jurisdiction with the most significant relationship. The public policy exception is another area where we have departed from traditional, rigid, choice-of-law rules and refused to apply the law of the place of contracting where to do so would violate some strong public policy of Maryland. *See National Glass,* 336 Md. at 615, 650 A.2d at 250. We are not yet, however, ready to jettison *lex loci contractus* except in those instances already noted. *Lex loci contractus* is still the law in the majority of jurisdictions, although there is a significant modern erosion of the rule. If that erosion continues, however, this Court may, in the proper case, have to reevaluate what the best choice-of-law rules ought to be to achieve simplicity, predictability, and uniformity.

## II.

Having determined that Maryland law will apply to the substantive issues presented in the instant case, we next address American Motorists's argument that the Court of Special Appeals incorrectly found that American Motorists had a duty to defend ARTRA in the Sherwin–Williams action.

---

6. *See* Richard W. Bourne, *Modern Maryland Conflicts: Backing into the Twentieth Century One Hauch at a Time,* 23 U.Balt.L.Rev. 71 (1993) (discussing a perceived movement in Maryland cases away from territorialist rules and arguing that Maryland courts should abandon adherence to the First Restatement).

American Motorists also argues that the Court of Special Appeals incorrectly held that American Motorists's duty to indemnify ARTRA in the Sherwin–Williams action could not be determined in a declaratory judgment action. We find that the circuit court ruled correctly on both of these issues, and we therefore reverse the Court of Special Appeals.

■ In *Brohawn v. Transamerica Ins. Co.*, 276 Md. 396, 347 A.2d 842 (1975), we held that:

> "The obligation of an insurer to defend its insured under a contract provision . . . is determined by the allegations in the tort actions. If the plaintiffs in the tort suits allege a claim covered by the policy, the insurer has a duty to defend. Even if a tort plaintiff does not allege facts which clearly bring the claim within or without the policy coverage, the insurer still must defend if there is a *potentiality* that the claim could be covered by the policy." (Emphasis in original) (citations omitted).

276 Md. at 407–08, 347 A.2d at 850. We further clarified in *Aetna v. Cochran*, 337 Md. 98, 651 A.2d 859 (1995) that an insured may establish a potentiality of coverage if the "insured demonstrates that there is a reasonable potential that the issue triggering coverage will be generated at trial." 337 Md. at 112, 651 A.2d at 866. Thus, in determining whether a potentiality of coverage exists under an insurance contract, we must look at the terms of the policy and view them both in light of the allegations of the tort suit and in light of appropriate extrinsic evidence. We note that "[t]he primary principle of construction of insurance policies is to apply the terms of the contract." *Mitchell v. Maryland Casualty*, 324 Md. 44, 56, 595 A.2d 469, 475 (1991). In so doing, we accord the terms of the contract their "customary, ordinary, and accepted meaning." *Mitchell*, 324 Md. at 56, 595 A.2d at 475.

Each of the American Motorists policies contained a pollution exclusion which stated that there would be no coverage for:

> "bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot,

fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is *sudden and accidental*." (Emphasis added).

In *Bentz, supra*, the Court of Special Appeals discussed the meaning of the terms "sudden" and "accidental" in the context of a pollution exclusion in an insurance contract. In *Bentz*, plaintiffs hired a pesticide applicator to treat their new home. They later sued the exterminator for negligence and recklessness in the application of the pesticides. The exterminator's insurer denied coverage for the homeowner's claim based on a virtually identical pollution exclusion to the one in the instant case. The insurer argued that the exterminator's actions did not fall within the policy because the claim arose out of an intentional discharge of a toxic chemical which was neither sudden nor accidental. *Bentz*, 83 Md.App. at 530, 575 A.2d at 798. The Court of Special Appeals found there was coverage.

Interpreting the meaning of "sudden" and "accidental," the Court of Special Appeals held that "[t]here is nothing intrinsically unclear about the terms 'sudden' and 'accidental.'" *Bentz*, 83 Md.App. at 537, 575 A.2d at 801. The court further clarified that under a pollution exclusion precluding coverage for all pollution except that which is sudden and accidental, the exception only applies when the discharge, rather than the injury resulting from the discharge, is sudden and accidental. *Bentz*, 83 Md.App. at 538, 575 A.2d at 802. Defining the terms "sudden" and "accidental" in terms of the conduct of the pesticide applicator, the court held:

"It was accidental in that it was unintended; in the words of Webster's *New Twentieth Century Dictionary Unabridged* 11 (2d ed. 1975) definition of 'accidental,' it 'happen[ed] by chance,' it was 'not expected,' it was 'fortuitous,' it took place 'not according to the usual course of things,' it was not 'constant, regular, or intended.' It was sudden in that the inappropriate contact, from which the harm arose, was more or less instantaneous. The chemicals, we presume, were

sprayed directly onto the surfaces; they did not seep there. The discharge that caused the harm was from the applicator directly to the targeted surface."

*Bentz,* 83 Md.App. at 540, 575 A.2d at 803. Construing the pollution exclusion as a whole, the court held:

" 'The contract is clear: "occurrences," as defined, are covered *unless* the occurrences arise out of pollution events; those are not covered *unless* such pollution events are sudden and accidental. Read as a whole, the policy covers "continued and repeated exposures" except for exposures to pollution; then it covers only "sudden and accidental" events.' " (Emphasis in original).

*Bentz,* 83 Md.App. at 538, 575 A.2d at 801–02 (quoting *American Motorists Ins. Co. v. General Host Corp.,* 667 F.Supp. 1423, 1429 (D.Kan.1987), *aff'd,* 946 F.2d 1482 (10th Cir.1991)).

The circuit court applied Maryland law and relied on the Court of Special Appeals's opinion in *Bentz* for a definition of the terms "sudden" and "accidental" in the pollution exclusion present in the instant case. The judge looked to the allegations of the underlying complaint and found that:

"I have to look to see what the [c]ourts have called sudden and accidental; and then I rely upon the case of *Bentz v. Mutual Fire....* I think that case is clear and I think that this exception means that you have not pled sufficient facts to escape from the exclusion of the policy and to bring yourself into the inclusion.

The history of this case shows that there were over 20 years of releases and various allegations of environmental damage through nine policies of which apparently the same clause was repeated in policy after policy.

\* \* \* \* \* \*

[I]n finding that Maryland law applies, I'm unable to find anything in the pleadings which are factually pled which would bring this case within the purview of this policy."

The circuit court therefore determined that the word "sudden" meant quick or instantaneous, as defined in *Bentz* and that the

pollution claim in the instant case is excluded from coverage because the underlying complaint alleges that the pollution occurred over the course of many years, i.e., not instantaneously or quickly. Accordingly, the circuit court determined that the pollution was not sudden. The circuit court therefore concluded that American Motorists had no duty to defend or indemnify ARTRA in the Sherwin–Williams action and granted American Motorists's motion for summary judgment.

In contrast, the Court of Special Appeals found that under the applicable Illinois law, or under Maryland law, a potentiality of coverage existed. The court found that:

> "[T]here are allegations [in the complaint] that at least some of the pollution at the site occurred under circumstances that might well be deemed to be 'sudden and accidental' under either construction of that language. In addition to alleging that ARTRA and its predecessors negligently and illegally stored drums of hazardous and toxic chemicals on the site and that many of those drums leaked their contents onto the ground, Sherwin–Williams's complaint alleged, *inter alia*, that spills of hazardous substances occurred as a result of regular operations of the plant; that during filling operations some tanks were negligently filled beyond capacity causing overflows of hazardous materials to be released into the soil; and that drums of hazardous materials were negligently handled and some were punctured by forklifts. On the basis of those allegations, we believe that whether the 'sudden and accidental' language of the exception to the pollution exclusion clause is interpreted to mean 'precipitous' or 'abrupt' and accidental (Maryland view) or 'unintended' or 'unexpected' and accidental (Illinois view),[7] the lower court erred in concluding that no potentiality for

---

7. The Court of Special Appeals noted that in *Outboard Marine v. Liberty Mut. Ins.*, 154 Ill.2d 90, 180 Ill.Dec. 691, 607 N.E.2d 1204 (1992), the Supreme Court of Illinois held that the term "sudden" in a pollution exclusion was ambiguous and must be construed in favor of the insured to mean unexpected or unintended. *ARTRA Group v. American Motorists*, 100 Md.App. 728, 740, 642 A.2d 896, 902 (1994).

coverage exists under the [American Motorists] policies." (Footnote added).

*ARTRA,* 100 Md.App. at 740, 642 A.2d at 902. Having found a potentiality of coverage, the Court of Special Appeals further held that summary judgment as to American Motorists's duty to indemnify ARTRA was improper because key factual issues regarding whether the contamination at the Site was sudden and accidental remained to be determined in the underlying tort suit and American Motorists would have a duty to indemnify ARTRA should the contamination be found to be sudden and accidental. *ARTRA,* 100 Md.App. at 741, 642 A.2d at 903.

Both American Motorists and *amicus curiae,* Insurance Environmental Litigation Association ("IELA"), argue that the Court of Special Appeals's approach to the duty to defend constitutes a "microanalysis" of "a long-term pattern of polluting activity in the ordinary course of business in search of a potentially 'sudden' discharge." They further argue that such a microanalysis renders a pollution exclusion meaningless because "in every pollution case one can always isolate a specific and discrete moment in time when a release of a pollutant occurs or when a pollutant actually enters the environment," and that specific moment of release could always be described as "sudden."

We agree with the interpretation of the pollution exclusion clause adopted in numerous other cases such as *General Host, supra,* on which *Bentz* relied. Under those interpretations, the language of such an exclusion provides coverage only for pollution which is both sudden *and* accidental. It does not apply to gradual pollution carried out on an ongoing basis during the course of business. *See Bentz,* 83 Md.App. at 538, 575 A.2d at 801–02; *General Host,* 667 F.Supp. at 1429 ("Read as a whole, the policy covers 'continued and repeated exposures' except for exposures to pollution; then it covers only 'sudden and accidental' events."). The notion of giving a temporal aspect to the terms "sudden and accidental" and excluding coverage for gradual pollution has

been embraced by numerous other jurisdictions. *See, e.g., U.S. Fidelity and Guar. v. Star Fire Coals, Inc.,* 856 F.2d 31, 34 (6th Cir.1988) ("We do not believe that it is possible to define 'sudden' without reference to a temporal element that joins together conceptually the immediate and the unexpected."); *U.S. Fidelity & Guar. v. Morrison Grain Co.,* 734 F.Supp. 437, 446 (D.Kan.1990) ("To divorce 'sudden' of its temporal component would eviscerate it of any independent meaning or force."), *aff'd,* 999 F.2d 489 (10th Cir.1993); *Shell Oil v. Winterthur Swiss Ins.,* 12 Cal.App.4th 715, 15 Cal. Rptr.2d 815, 841 (1993) ("We cannot reasonably call 'sudden' a process that occurs slowly and incrementally over a relatively long time...."); *Truck Ins. Exchange v. Pozzuoli,* 17 Cal. App.4th 856, 21 Cal.Rptr.2d 650, 652 ("Any continuous event, whether it be of 30 years' or 2 months' duration, is simply not 'sudden.'"), *review denied,* (Cal. Nov. 17, 1993); *Lumbermens Mut. Cas. v. Belleville Ind.,* 407 Mass. 675, 555 N.E.2d 568, 572 (1990) ("For the word 'sudden' to have any significant purpose, and not to be surplusage when used generally in conjunction with the word 'accidental,' it must have a temporal aspect to its meaning, and not just the sense of something unexpected."), *cert. denied,* 502 U.S. 1073, 112 S.Ct. 969, 117 L.Ed.2d 134 (1992); *Hybud Equip. v. Sphere Drake Ins.,* 64 Ohio St.3d 657, 597 N.E.2d 1096, 1103 (1992) ("The inclusion of the word 'sudden' readily indicates that the exception was not intended to apply to a release that occurred over an extended time."), *cert. denied,* —— U.S. ——, 113 S.Ct. 1585, 123 L.Ed.2d 152 (1993).

In determining the meaning of the term "sudden" in a pollution exclusion, several jurisdictions have dealt with the issue of determining whether discrete events carried out on an ongoing basis during the regular course of business which contributed to an ongoing release of pollutants could be considered "sudden" releases under a pollution exclusion contained in an insurance contract. In *Ray Industries, Inc. v. Liberty Mut. Ins. Co.,* 974 F.2d 754 (6th Cir.1992), the United States Court of Appeals for the Sixth Circuit held that allegations of continuing pollution on a regular basis could not be

considered sudden. *See Ray Industries,* 974 F.2d at 768. In that case, a twenty-seven ton machine known as a "Trash Master" was used to move barrels containing waste from a boat manufacturing plant for a period of thirteen years. The machine had metal spikes which often tore apart the barrels, causing them to spill their contents. Additionally, the method for disposing of the barrels caused them to become crushed and leak their contents. The court held:

> "[The insured] has argued that each release was sudden, when viewed in isolation. But under this theory, *all* releases would be sudden; one can always isolate a specific moment at which pollution actually enters the environment. Rather than pursuing such metaphysical concepts, we choose to recognize the reality of [the insured's] actions in this case." (Emphasis in original).

*Ray Industries,* 974 F.2d at 768–69. Noting that "the barrels were routinely crushed on a regular basis," the *Ray Industries* court rejected a process of microanalysis and held that the activity was not sudden and was therefore not covered under the insurance policy. *Ray Industries,* 974 F.2d at 768–69.

In *A. Johnson & Co., Inc. v. Aetna Cas. and Sur. Co.,* 933 F.2d 66 (1st Cir.1991), the United States Court of Appeals for the First Circuit also rejected a microanalysis of each allegation contributing to a course of longstanding pollution. In *A. Johnson & Co.,* the insured had shipped chemicals during a two-year period to a waste disposal facility that was later designated as an uncontrolled hazardous substance site. The United States Environmental Protection Agency and the Maine Department of Environmental Protection sued the insured as a potentially responsible party and the insured brought a declaratory judgment action against its insurers, seeking a determination of the insurers duty to defend and indemnify. Addressing the duty to defend and indemnify under an insurance policy containing a pollution exclusion, the court noted that "sudden" was to be given "its unambiguous, plain and commonly accepted meaning of temporally abrupt." *A. Johnson & Co.,* 933 F.2d at 72. The court held that the

underlying allegations did not constitute sudden and accidental pollution which would bring the insured's action within coverage. *A. Johnson & Co.,* 933 F.2d at 75. The court further held:

"We are unpersuaded by [the insured's] contention that an allegation ... that '[c]racked tanks were observed in a leaking condition which released their contents onto the ground' ... could support a finding of a 'sudden and accidental' release. This does nothing to contradict the extensive allegations that a variety of disposal methods, including leakage from multiple storage tanks, contributed to the contamination in a course of conduct over a long period of time. Mere speculation under these circumstances that any individual instance of disposal, including leaks, occurred 'suddenly' cannot contradict a reasonable reading of the allegations that the entire pattern of conduct was not a 'sudden and accidental' occurrence."

*A. Johnson & Co.,* 933 F.2d at 75. *See also Lumbermens Mut. v. Belleville Industries,* 938 F.2d 1423, 1428 (1st Cir. 1991) (rejecting the use of microanalysis to determine whether specific events occurring during the ordinary course of business operations were "sudden and accidental" and noting the "infeasibility of attempting to assess discrete 'fringe' events, in the case of a company with a history of contributing over a lengthy period to a gradual accumulation of pollutants"), *cert. denied,* 502 U.S. 1073, 112 S.Ct. 969, 117 L.Ed.2d 134 (1992).

The Court of Appeals of Minnesota also held that when pollution is alleged to have occurred over a long period of time, individual instances of pollution may not be isolated to provide occurrences which are "sudden." *See Sylvester Bros. Dev. v. Great Cent. Ins.,* 503 N.W.2d 793, 797 (Minn.Ct.App.), *review denied,* (Minn. Sept. 30, 1993). In *Sylvester,* the insured argued that coverage should be provided for the costs of remediating groundwater contamination and that the court must look at each individual release in order to determine coverage. The court held that "[u]nder the [insured's] suggested approach, the 'sudden and accidental' exception essentially would swallow the 'rule' of the pollution exclusion clause

that pollution is not covered." *Sylvester,* 503 N.W.2d at 797. The court further held that "[t]here is no reason to engage in a release-by-release 'microanalysis' of whether each release was sudden when there has been a continuous pattern of pollution." *Sylvester,* 503 N.W.2d at 798.

We agree with the numerous cases holding that allegations of longstanding business activities resulting in pollution do not constitute allegations of "sudden and accidental" pollution. In the instant case, the underlying complaint alleges that:

"24. During the period of time that the Site was owned by ARTRA ... continuing to the time of the sale to Sherwin–Williams, thousands of drums of hazardous and toxic chemicals were being negligently, illegally and improperly stored on the Site. Many of these drums were leaking their hazardous contents onto the ground and into the soils and ultimately into the groundwater below the Site causing widespread contamination to the soils and groundwater.

25. The Site has been used since the mid to late 1940's for the manufacturing, packaging and distribution of paints, varnishes, adhesives and related chemical products.

26. During the period of time that ARTRA owned and operated the Site, to and including the day that it transferred the property to Sherwin–Williams, the Site contained numerous (over fifty) underground storage tanks, many of which were leaking and seeping their contents into the surrounding soils and into the groundwater on the Site. Many of these tanks were very old and unprotected and contained such hazardous substances as vinyl acetate, gasoline, diesel oil, 1,1,1,–trichloroethane, butyl acrylate monomer, toluene, naphtha, xylene, ethylene glycol, texanol, mineral spirits, varnish, chlorinated solvents and other volatile organic substances.

27. Plaintiff is informed and believes and alleges that during the period of time that ARTRA owned and/or operated the Site that numerous spills of hazardous substances

and hazardous wastes were released at the Site during and as a result of regular operations of the plant.

28. Plaintiff is informed and believes and alleges that during the period of time that ARTRA owned and/or operated the Site that discharges of hazardous and toxic substances were released into the storm drain system on the Site causing contamination to the soils and groundwater.

29. Plaintiff is informed and believes and alleges that during the period of time that ARTRA owned and/or operated the Site that during filling operations of underground storage tanks with hazardous substances and other toxic chemicals, some tanks were improperly and negligently filled sometimes beyond capacity, causing spills and overflows of hazardous and toxic substances to be released into the soils on the Site and possibly into the groundwater below the Site."

These allegations illustrate that the alleged pollution at the Site was due to a variety of ongoing activities which were part of routine business operations at the Site over a period of several years. Numerous other courts have held that such allegations of gradual pollution cannot be isolated to fall within the "sudden and accidental" language of the pollution exclusion. *See Smith v. Hughes Aircraft Co.,* 22 F.3d 1432, 1438 (9th Cir.1993) (rejecting attempts of an insured to " 'break down its long-term waste practices into temporal components in order to find coverage where the evidence unequivocally demonstrates that the pollution was gradual.' "); *Bureau of Engraving, Inc. v. Federal Ins. Co.,* 5 F.3d 1175, 1177–78 (8th Cir.1993) (refusing to require a "discharge-by-discharge inquiry" before granting summary judgment under the pollution exclusion where evidence established that hazardous wastes had been leaking from barrels for almost ten years.); *Star Fire Coals,* 856 F.2d at 35 ("The 'sudden and accidental' exception to [the pollution] exclusion is inapplicable here where the pollutants at issue were discharged on a regular ongoing basis."); *Anaconda Minerals v. Stoller Chemical,* 773 F.Supp. 1498, 1507 (D.Utah 1991) (rejecting insureds "attempts to distinguish discrete episodes of pollution from rou-

tine operations over the years"), *aff'd,* 990 F.2d 1175 (10th Cir.1993); *Borden, Inc. v. Affiliated FM Ins. Co.,* 682 F.Supp. 927, 930 (S.D.Ohio 1987) (finding no coverage where underlying complaint alleged that insured regularly deposited radioactive wastes on its property as part of its production process and noting that "[s]everal other courts have held that the pollution exclusion applied to the release of wastes on a regular basis or in the ordinary course of business"), *aff'd,* 865 F.2d 1267 (6th Cir.), *cert. denied,* 493 U.S. 817, 110 S.Ct. 68, 107 L.Ed.2d 35 (1989); *Fischer & Porter Co. v. Liberty Mut. Ins. Co.,* 656 F.Supp. 132, 140 (E.D.Pa.1986) ("Employee practices, attributed to management, of pouring contaminants into floor drains or into other areas which caused leaching into the groundwater are not 'sudden and accidental' events."); *Landauer, Inc. v. Liberty Mut. Ins. Co.,* 36 Mass.App.Ct. 177, 628 N.E.2d 1300, 1303 (ruling that insurer had no duty to defend policy holder in governmental enforcement action concerning contamination of soil and groundwater near a landfill, and rejecting argument that some discharges may have occurred suddenly and accidentally since entire pattern of conduct was not a sudden and accidental occurrence), *review denied,* 417 Mass. 1105, 635 N.E.2d 252 (1994). *Cf. Great Lakes Container v. National Union Fire Ins.,* 727 F.2d 30 (1st Cir.1984) (finding no coverage under pollution exclusion where underlying complaint alleged pollution to have taken place as a concomitant of insured's regular business activity).

■■■ The allegations of the Sherwin–Williams complaint clearly show that the claim is based on a pollution problem alleged to have resulted from the cumulative effects of numerous releases which occurred on an ongoing basis as part of the regular course of business over a long period of time. As the Court of Special Appeals noted, the Sherwin–Williams complaint seeks damages "for the collective effects of these various forms of contamination." *ARTRA,* 100 Md.App. at 733, 642 A.2d at 898. The Sherwin–Williams complaint expressly alleges that the environmental harm arose out of releases that occurred from 1946 until 1980. The complaint alleges that the pollutants, after being released over a long period of time,

gradually seeped into the soil and groundwater at the Hollins Ferry Site. We agree with the circuit court and the majority of other jurisdictions that such allegations of various, continuing polluting activities, occurring over a long period of time and in the course of business operations, do not give rise to a potentiality of coverage under the "sudden and accidental" language of the pollution exclusion. Thus, we do not believe that the Hollins Ferry Site was polluted "suddenly" but was rather polluted over the course of several years.

 Having found no potentiality of coverage, we further hold that the circuit court was correct in granting declaratory judgment on both American Motorists's duty to defend and indemnify. The Court of Special Appeals held that American Motorists's duty to indemnify ARTRA could not be determined in a declaratory judgment action because key factual issues remained to be determined regarding whether the pollution alleged was sudden and accidental. *ARTRA,* 100 Md.App. at 741, 642 A.2d at 903. We disagree.

Recently in *Chantel Associates v. Mount Vernon Fire Insurance Company,* 338 Md. 131, 147, 656 A.2d 779, 787 (1995), we held that:

> " 'A declaratory judgment action prior to the trial of a tort action against the insured may under some circumstances be a valuable means of resolving questions of policy coverage where those questions are independent and separable from the claims asserted in a pending suit. . . .
>
> \* \* \* \* \* \*
>
> But where . . . the question to be resolved in the declaratory judgment action will be decided in [a] pending action[ ], it is inappropriate to grant a declaratory judgment.' " (Citation omitted).

338 Md. at 147, 656 A.2d at 787 (quoting *Brohawn, supra,* 276 Md. at 405–06, 347 A.2d at 848–49); *see also Allstate v. Atwood,* 319 Md. 247, 254, 572 A.2d 154, 157 (1990); *Maryland Auto. Ins. Fund v. Sun Cab Co.,* 305 Md. 807, 810, 506 A.2d 641, 643 (1986).

In the instant case, we have found that the allegations of the underlying complaint cannot be read to assert that the pollut-

ing activities alleged, which occurred over a period of several years, were "sudden and accidental." Therefore, there is no potentiality of coverage and no issues to be determined at trial which are intertwined with American Motorists's duty to provide coverage to ARTRA. Having found no potentiality of coverage, we find no basis on which American Motorists could be held liable to indemnify ARTRA for any judgment rendered against it in the Sherwin–Williams action.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO AFFIRM THE JUDGMENT OF THE CIRCUIT COURT. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY RESPONDENT.*

RAKER, J., dissenting:

## CONFLICT OF LAWS

CONFLICT OF LAWS with its peppery seasoning,
Of pliable, scarcely reliable reasoning,
Dealing with weird and impossible things,
Such as marriage and domicil, bastards and kings,
All about courts without jurisdiction,
Handing out misery, pain and affliction,
Making defendant, for reasons confusing,
Unfounded, ill-grounded, but always amusing
Liable one place but not in another
Son of his father, but not of his mother,
Married in Sweden, but only a lover in
Pious dominions of Great Britain's sovereign.
Blithely upsetting all we've been taught,
Rendering futile our methods of thought,
Till Reason, tottering down from her throne,
And Common Sense, sitting, neglected, alone,
Cry out despairingly, "Why do you hate us?

Give us once more our legitimate status."
Ah, Students, bewildered, don't grasp at such straws,
But join in the chorus of Conflict of Laws.

Chorus

Beale, Beale, wonderful Beale,
Not even in verse can we tell how we feel,
 When our efforts so strenuous,
 To over-throw,
 Your reasoning tenuous,
 Simply won't go.
 For the law is a system of
 wheels within wheels
 Invented by Sayres and Thayers and Beales
 With each little wheel
 So exactly adjusted,
 That if it goes haywire
 The whole thing is busted.
 So Hail to Profanity,
 Goodbye to Sanity,
Lost if you stop to consider or pause,
On with the frantic, romantic, pedantic,
Effusive, abusive, illusive, conclusive,
Evasive, persuasive Conflict of Laws.

Thurman Arnold, *Fair Fights and Foul: A Dissenting Law-yer's Life* 21–22 (1965) (footnotes omitted).

SECOND VERSE

If Arnold thought reason had gone from its throne
Clear back in '14, O now how he'd groan
For Babcock and Jackson had a terrible row
And seeds of new policy surely did sow.
The seeds were from plants nursed in academia's groves

And from '20 to '60 grew in great droves;

But, once out of the classroom and into the courts

The profuse little seedlings grew into sports.

Though the new growth was reason supplanting mere rites

When growing in Academe's neat little sites;

In real rows the neat rows fit nothing quite right,

And we often get darkness instead of new light.

But if light be our metaphor, mixed as it is,

Old light was dimmer and fuzzy as fizz;

Nothing it showed but shadow to fools

Who mistake simple outlines for the sureness of rules.

Now New light makes "sense" always the goal

And explores each case nuance with the Restated tools

So, Lawyers, relax, break up the old straws,

And join in the chorus of Conflict of Laws.

McLaughlin, *Conflict of Laws: The New Approach to Choice of Laws: Justice in Search of Certainty, Part Two,* 94 W.Va. L.Rev. 73, 108 n. 65 (1991).

Today, the majority fails to shed new "light" on the murky maze of Conflict of Laws. Instead, in an unwarranted departure from the bedrock of Maryland choice of law in contract cases—*lex loci contractus*—the majority adopts a "limited *renvoi* exception." Majority Op. at 20. In so doing, it unwisely qualifies a solid, predictable rule in favor of the often criticized and rejected doctrine of *renvoi*.[1] In my view, it

---

1. *Renvoi* has been rejected not only by most scholars, but also by most of our sister states and the Restatement (Second) of Conflict of Laws (1971), except in special circumstances not relevant in the instant case. *See Cooper v. Ross & Roberts, Inc.,* 505 A.2d 1305, 1307 n. 3 (Del.Super.Ct.1986); *Polglase v. Greyhound Lines, Inc.,* 401 F.Supp. 335, 337 (D.Md.1975); *Hobbs v. Firestone Tire & Rubber Co.,* 195 F.Supp. 56, 59 (N.D.Ind.1961).

 This doctrine has also been soundly rejected by most early scholars and judges. Professor Lorenzen concluded:
 The *renvoi* doctrine, is therefore, no part of the conflict of laws of the United States. Its introduction into our law would be most unfortunate on account of the uncertainty and confusion to which it would

makes no "sense" in the instant case to curtail Maryland's well-established rule.

Moreover, the facts of this case do not lend support to the engrafting or the application of *renvoi.* Under an Illinois choice-of-law analysis, Illinois would most likely apply Illinois substantive law to interpret the insurance contract, *not* Maryland substantive law.[2] Thus, this is not a case in which both the foreign state and the forum would apply the law of the forum.

I believe that today's decision will lead to uncertainty, confusion, and unpredictability. Accordingly, I respectfully dissent.

---

give rise in the administration of justice and its demoralizing effect upon the future development of the Conflict of Laws.

Lorenzen, *The* Renvoi *Theory and the Application of Foreign Law,* 10 Colum.L.Rev. 327, 344 (1910). In a later article, Professor Lorenzen noted that "[n]o proper system of the conflict of laws can be built up among the civilized nations as long as this doctrine remains." Lorenzen, *The* Renvoi *Doctrine in the Conflict of Laws—Meaning of "The Law of a Country,"* 27 Yale L.J. 509, 528 (1918). He concluded that "[i]ts days ought to be few after its deceptive character is fully understood." *Id.* at 529. *See also* Schreiber, *Doctrine of* Renvoi *in Anglo–American Law,* 31 Harv.L.Rev. 523, 571 (1918) ("An examination into its merits and demerits will, it is believed, require its rejection in all but the most exceptional cases.").

2. *See Sandefer Oil & Gas, Inc. v. AIG Oil Rig of Texas, Inc.,* 846 F.2d 319, 324 (5th Cir.1988) (finding that the location of the risk is less significant when the policy covers risks in several states); *Gould, Inc. v. Continental Casualty Co.,* 822 F.Supp. 1172, 1176 (E.D.Pa.1993) (same); *St. Paul Surplus Lines Insurance Co. v. Diversified Athletic Services,* 707 F.Supp. 1506 (N.D.Ill.1989) (same); RESTATEMENT (SECOND) CONFLICT OF LAWS §§ 188, 193 (1971); *see also Continental Insurance Co. v. Beecham, Inc.,* 836 F.Supp. 1027 (D.N.J.1993) (finding that for environmental damage cases, application of the law of the state of the pollution cite would lead to inconsistent results); *Potomac Elec. Power Co. v. California Union Ins. Co.,* 777 F.Supp. 968, 972 (D.D.C.1991) (deciding that the state containing the headquarters of the insured was the state with the most significant contacts).