Patricia BALL, Plaintiff,

v.

NCRIC, INC., Defendants.

No. Civ.A. AW–00–832.

United States District Court, D. Maryland.

April 30, 2001.

---

Gregory C. Mitchell, Washington, DC, for plaintiff.

Lee T. Ellis, Jr., Baker & Hostetler, Washington, DC, for defendant.

## MEMORANDUM OPINION

WILLIAMS, District Judge.

Presently before the Court are Defendant NCRIC, Inc.'s Motion for Summary Judgment and Plaintiff Patricia Ball's Cross–Motion for Summary Judgment. Oppositions have been filed by both parties, therefore the motions are ripe for resolution.[1] No hearing is deemed necessary. *See* Local Rule 105.6 (D.Md.). For the reasons discussed below the Court will grant Defendant's Motion for Summary Judgment and deny Plaintiff's Cross–Motion for Summary Judgment.

## BACKGROUND

Defendant NCRIC is an insurance company that insures doctors against medical malpractice claims. In February, 1987, Dr. Daniel sent an application to NCRIC at its offices in Washington, D.C. applying for medical malpractice insurance. At the time, Dr. Daniel was a research fellow at the National Institute of Health. NCRIC issued Dr. Daniel an insurance policy for medical malpractice on May 21, 1987. The policy was in effect from March 19, 1987 until June 1, 1987, and then renewed from June 1, 1987 until its cancellation on Janu-

---

1. On April 13, 2001, the Court invited both parties to comment on the recent Maryland Court of Appeals decision, *Allstate Insurance Company v. State Farm Mutual Automobile Insurance Company, et. al.*, 363 Md. 106, 767 A.2d 831 (2001) feeling that the case had a direct bearing on the above captioned matter. Both parties submitted briefs based on the Court's letter and were considered for purposes of deciding the instant motions.

ary 1, 1988. During this time, Dr. Daniels operated an innovative home physician service that provided medical treatment during house calls to patients.

From April 22, 1987 to November 1987, Dr. Daniel treated Plaintiff, Ms. Ball for migraine headaches and depression. During these home visits to Ms. Ball, Dr. Daniel would administer a variety of drugs to Ms. Ball, all of which she had no prescription for. Those drugs included Demerol, a narcotic; Valium, a tranquilizer; Percodan, an narcotic; Fiorinal, a tranquilizer; and Vistaril, a tranquilizer. As a result of taking all of these drugs in various quantities, Ms. Ball was put into a state of stupor, during which time, Dr. Daniels would coerce Ms. Ball into engaging in sexual intercourse with him. Dr. Daniel was arrested in November, 1987 on separate charges of illegally selling prescriptions for powerful pain-killing narcotics from public parking lots to undercover agents. Dr. Daniel was arraigned and released on $200,000 bond. Dr. Daniel fled the country and did not return for his February 22, 1988 guilty plea date. After an almost three year search, Dr. Daniel was captured in May 1991.

NCRIC made the decision to cancel Dr. Daniel's medical malpractice insurance upon learning of the circumstances surrounding his federal criminal indictment. The insurance policy was terminated as of January 1, 1988. Dr. Daniel was informed on November 13, 1987, by letter, of the impending cancellation of his insurance policy. Defendant's Motion for Summary Judgment, Exhibit J. Dr. Daniel was informed that he had ten (10) days upon receipt of the letter to request a review of NCRIC's decision. Id. On November 19, 1987, by letter, Deborah R. Cason, an attorney, requested a review of NCRIC's decision on behalf of Dr. Daniel. Id. at Exhibit K. In a follow up letter, Ms. Cason

informed NCRIC that Dr. Daniel would not be available to attend a hearing concerning the renewal of his malpractice insurance until after his trial on February 4, 1988. Id. at Exhibit L. Dr. Daniels was given the opportunity to purchase tail coverage that would have extended the time in which a claim might be reported that occurred while the policy was in effect. Id. at Exhibit M. However, Dr. Daniel did not purchase such an insurance extension.

When the news of Dr. Daniel's arrest and subsequent flight appeared in the media, Ms. Ball became aware of the alleged acts committed by Dr. Daniel upon her. Plaintiff's attorney called NCRIC to advise them that Ms. Ball would be filing a claim against one of its insured. That conversation was memorialized in a hand delivered letter dated December 15, 1987. Id. at Exhibit U. Again, on January 11, 1988, Ms. Ball's attorney sent another letter to NCRIC informing them of their involvement in Ms. Ball's claim against Dr. Daniel, and informing NCRIC that Dr. Daniel had been notified through a December 23, 1987 letter sent to his attorney in Baltimore. Ms. Ball was unable to pursue her claim against Dr. Daniel until he returned to custody in May, 1991. In April 1992, Ms. Ball filed a statement of claim before the Health Claims Arbitration Office of Maryland. Id. at Exhibit H. NCRIC did not defend Dr. Daniel in the matter because it had denied coverage to Dr. Daniel on January 1, 1988. On February 9, 1996, the Panel appointed by the Health Claims Arbitration Office returned a decision in favor of Ms. Ball in the amount of $310,000 against Dr. Daniel. Plaintiff's Counter Motion for Summary Judgment, Exhibit # 5. A final judgment was entered against Dr. Daniel on behalf of Ms. Ball in the amount of $310,000 by the Circuit Court for Prince George's County on September 24, 1996. Throughout the whole process, Dr. Daniel was not defended by

NCRIC. Plaintiff file suit against NCRIC in the Circuit Court for Prince George's County, as a third party beneficiary alleging a breach of insurance contract and negligence. Defendant NCRIC removed the instant case to the United States District Court for the District of Maryland.

## STANDARD FOR SUMMARY JUDGMENT

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment will be granted when no genuine dispute of material fact exists and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). While the evidence of the non-movant is to be believed and all justifiable inferences drawn in its favor, a party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences. *See Deans v. CSX Transportation, Inc.,* 152 F.3d 326, 330–31 (4th Cir.1998); *Beale v. Hardy,* 769 F.2d 213, 214 (4th Cir.1985). To defeat such a motion, the party opposing summary judgment must present evidence of specific facts from which the finder of fact could reasonably find for him. *See Anderson,* 477 U.S. at 252, 106 S.Ct. 2505; *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex,* 477 U.S. at 327, 106 S.Ct. 2548 (citations omitted). Accordingly, in determining whether genuine and material factual disputes exist, the Court has reviewed the memorandums and the exhibits attached thereto, construing all facts, and all reasonable inferences drawn therefrom, in the light most favorable to the non-

movant. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## DISCUSSION

### I. Applicable Law

 The parties differ over which forum's laws should govern the insurance contract. Defendants believe that District of Columbia law should govern this case because the creation of the insurance contract was in the District. NCRIC is located in the District of Columbia and Dr. Daniel sent all information and premium payments to NCRIC's location in the District. However, as Plaintiff points out, the insured resided and practiced medicine in the state of Maryland. Furthermore, Dr. Daniel's acts against Ms. Ball, which are the basis for the instant action, all took place within the state of Maryland. Maryland courts have recently adopted a limited *renvoi* doctrine in determining which forum's law to apply. *American Motorists Insurance Co. v. ARTRA Group, Inc.,* 338 Md. 560, 659 A.2d 1295 (1995). Blacks Law Dictionary defines the *renvoi* doctrine as a doctrine in which the courts, when faced with a conflict of law situation, adopts the law of the foreign forum. Under the limited exception carved out by the Maryland Court of Appeals, Maryland courts should apply Maryland substantive law to contracts entered into in another forum when: "(1) Maryland has the most significant relationship, or, at least, a substantial relationship with respect to the contract issue presented; and (2) the state where the contract was entered into would not apply its own substantive law, but instead would apply Maryland substantive law to the issue before the court." *Id.* at 579, 659 A.2d 1295.

The instant case easily satisfies the first prong of the *American Motorists Insur-*

*ance Co.* test. As previously stated, Dr. Daniel resided and worked in Maryland. He was registered as a Maryland doctor. Furthermore, all incidents with Ms. Ball, the subject of the claim, took place in Maryland. The District of Columbia's only connection with the case is that NCRIC was located in the District and the premiums and application where sent into the District. There is no evidence that Dr. Daniels even traveled into the District to sign for the policy. NCRIC was insuring a Maryland doctor, where the likelihood of any insurable acts were to take place. Therefore, Maryland has a substantial relationship to the contract issue presented. The second prong is more difficult to meet. There was no intention by Defendant's to impose District of Columbia law on contract issues between NCRIC and Dr. Daniels. The insurance contract contains no policy provisions stating which forum's laws will apply to any contract disputes. The District's only connection with the insurance contract is that the company is located in the District. However, an insurance company must anticipate that its insureds will work in many different jurisdictions. Additionally, Maryland has a strong interest in protecting the expectations of doctors who practice in the state. Because the interests of Maryland outweighed the interests of the District of Columbia, the District would apply Maryland law to the instant case if filed within its jurisdiction. *Vaughan v. Nationwide Mutual Insurance Co.,* 702 A.2d 198 (D.C.App.1997). Since the facts of the above captioned case meet the *American Motorists Insurance Co.* test for the *renvoi* doctrine exception, this Court will apply Maryland law to the instant case.

## II. Denial of Coverage for Failure to Cooperate

█ Ms. Ball has alleged that NCRIC had a duty to represent Dr. Daniel under the medical malpractice insurance policy. Plaintiff alleges that NCRIC should have represented Dr. Daniel at the Health Claim Arbitration Office proceedings or settle any claim brought against Dr. Daniel. NCRIC has denied having a duty to defend or represent Dr. Daniels for numerous reasons. Dr. Daniel's medical malpractice insurance policy with NCRIC provided that Defendant shall have the right and duty to defend any suit against the insured brought during the policy period. Defendant points out that Dr. Daniel's coverage with NCRIC ended on January 1, 1988 and the claims brought against Dr. Daniel were not brought until April 1992. Furthermore, Dr. Daniel was under a duty to inform NCRIC of any action brought against him. NCRIC received notice of a potential claim that might be brought by Ms. Ball, but Dr. Daniel didn't give NCRIC notice of any claim until well after the policy was terminated. Finally, Defendant argues that Dr. Daniel's non cooperation with NCRIC precludes their duty to defend or represent Dr. Daniel in any claim brought against him.

The non cooperation issue raised by NCRIC is the determinative issue in the instant case. NCRIC, pursuant to Md. Code Ann., Insurance § 19–110 (2000), required Dr. Daniel to cooperate with any investigation of a claim as a prerequisite for coverage. Section 19–110 of the insurance article specifically states that:

An insurer may disclaim coverage on a liability insurance policy on the ground that the insured or a person claiming the benefits of the policy through the insured has breached the policy by failing to cooperate with the insured or by not giving the insurer required notice only if the insurer establishes by a preponderance of the evidence that the lack of cooperation or notice has resulted in actual prejudice to the insurer.

Id. The Maryland Court of Appeals has recently weighed in on the standard for non cooperation in an insurance case. *Allstate Insurance Company v. State Farm Mutual Automobile Insurance Company, et. al.,* 363 Md. 106, 767 A.2d 831 (2001). In *Allstate,* the Maryland Court of Appeals clarified its standard of when non cooperation can preclude an insurance company from defending its insured. In *Allstate,* State Farm's insured did not cooperate in the investigation of her automobile accident. The trial court found that State Farm was actually prejudiced but only to the extent of half of the judgment entered. The Maryland Court of Special Appeals determined that State Farm was excused from paying the entire judgment. The court of appeals affirmed the court of special appeals' decision. In doing so, the court stated that, "the proper focus should be on whether the insured's willful conduct has, or may reasonably have, precluded the insurer from establishing a legitimate jury issue of the insured's liability, either liability *vel non* or for the damages awarded." *Id.* at 843, 767 A.2d 831. The insurer must show that, "the failure of cooperation has, in a significant way, precluded or hampered it from presenting a credible defense to the claim." *Id.* Plaintiff argues that Defendant mounted no effort to investigate the case, and therefore have not shown any prejudice by Dr. Daniel's lack of cooperation.

Following the January 19, 1988 letter from Ms. Ball's counsel, NCRIC began to investigate Ms. Ball's potential claim against Dr. Daniel. Initially, on January 27, 1988, NCRIC attempted to call Dr. Daniel at home and at work, but without success. Defendant's Motion for Summary Judgment, Exhibit R. On May 24, 1988, NCRIC spoke with Ms. Ball's attorney and stated to him that they were going to investigate the claim made against Dr. Daniel and it was suggested to Ms. Ball's attorney that NCRIC be provided all of Ms. Ball's medical records. Id. at Exhibit X. NCRIC further cautioned Ms. Ball's attorney that Dr. Daniel's cooperation would be needed, but it was not anticipated that it would be received. From this point until 1991, Dr. Daniel was a fugitive from justice. On May 27, 1988, NCRIC sent a letter to Dr. Daniel informing him of Ms. Ball's allegations against him and his duty to cooperate with the insurer. The letter was sent to three addresses known for Dr. Daniel, including a Canadian address from where, on February 22, 1988, Dr. Daniels had written NCRIC requesting a refund for the remaining premium payment after the cancellation. Id. at Exhibit Y. All three letters were returned to NCRIC marked "Return to Sender." Id. Plaintiff counters with the argument that when Dr. Daniel was detained at the Montgomery County Detention Center, NCRIC was notified on or about February 10, 1992 about Dr. Daniel's whereabouts. At that time NCRIC did not attempt to interview Dr. Daniel and gather information. NCRIC does not deny that it did not attempt to speak with Dr. Daniel because NCRIC had already denied coverage to Dr. Daniel because of his non cooperation. Furthermore, there was a dispute as to whether NCRIC was on notice during Dr. Daniel's policy period about Ms. Ball's claim.[2] Finally, Ms. Ball did not file a claim against Dr. Daniel until April, 1992.

NCRIC asserts that it was prejudiced by Dr. Daniel's non cooperation. Dr. Daniel was the only other witness to the events, other than Ms. Ball. NCRIC be-

---

**2.** NCRIC appears to be on notice of Ms. Ball's claim by virtue of the December 15, 1987 letter sent by her attorney Gregory C. Mitchell memorializing a telephone conversation the day earlier.

lieves that Dr. Daniel could have provided an explanation to the alleged events. For example, Dr. Daniel could have stated that Ms. Ball preferred to have sex while on drugs to enhance the pleasure or that Ms. Ball consented to the sexual relations. However, without Dr. Daniel's version of the events, NCRIC contends that they were hampered in preparing a defense for Dr. Daniel. The Court agrees that NCRIC was prejudiced by Dr. Daniel's non cooperation. Based on the analysis followed in *Allstate*, this Court believes that Dr. Daniel's non cooperation has, in a significant way, precluded or hampered NCRIC from presenting a credible defense to Ms. Ball's claim. To begin with, NCRIC made a good faith effort to investigate Ms. Ball's claim. Letters were sent to Dr. Daniel at all known addresses. It is clear from the record that Dr. Daniel's non cooperation was willful. When Dr. Daniel wanted to contact NCRIC in order to change his address or ask for a refund on a premium payment, he did not hesitate to write NCRIC a letter and give them his address at the time. However, all attempts to get his version of the story were rejected by the insured. NCRIC properly made a determination not to cover Dr. Daniel. Without his testimony, NCRIC was deprived of the other half of the story and a chance to discover any mitigating circumstances to defend against Ms. Ball's claim. Finally, NCRIC was unable to ascertain whether Ms. Ball's claims against Dr. Daniel were intentional torts, which are not covered under the policy NCRIC provided Dr. Daniel, or whether they were medical malpractice claims, which would fit under the policy. At the time that Dr. Daniel was available for an interview, NCRIC had already denied coverage to him and where no longer under a duty to investigate Ms. Ball's claim. Therefore, this Court finds that Dr. Daniel's non cooperation in the investigation of Ms. Ball's

claims, as required under the insurance coverage provided, precluded and hampered NCRIC from presenting a defense to Ms. Ball's claims. Thus, NCRIC has no duty to defend Dr. Daniels.

### CONCLUSION

The Court will grant Defendant's Motion for Summary Judgment and deny Plaintiff's Motion for Summary Judgment. Dr. Daniel's lack of cooperation while his insurer NCRIC was investigating Ms. Ball's claims made against him, hampered Defendant's efforts to defend Dr. Daniel. Furthermore, any future attempts by Defendant to investigate the claim could only have come after NCRIC denied coverage to Dr. Daniel. Therefore, Dr. Daniel's non cooperation justifies NCRIC's denial of coverage to Dr. Daniel. The above captioned case will be dismissed against Defendant. A separate Order consistent with this Opinion will follow.